Marko DUROVIC, an Individual and also known as Marko Durovic, formerly d/b/a Duga Laboratories et al., Plaintiffs-Appellants,

v.

Elliot RICHARDSON, Secretary of Health, Education & Welfare, and Charles C. Edwards, Commissioner of Food & Drugs, Defendants-Appellees.

No. 71–1658.

United States Court of Appeals, Seventh Circuit.

Argued June 20, 1972.

Decided April 25, 1973.

As amended May 18, 1973.

---

Anna R. Lavin, Chicago, Ill., Solomon H. Friend, New York City, for plaintiffs-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, James C. Murray, Asst. U. S. Attys., Chicago, Ill., and Cheryl S. Karner, Atty., Consumer Division Dept. of Justice, Washington, D. C., for defendants-appellees.

Before FAIRCHILD, CUMMINGS, and STEVENS, Circuit Judges.

FAIRCHILD, Circuit Judge.

Plaintiffs appeal from an unfavorable declaratory judgment entered on defendants' motion for summary judgment in plaintiffs' action for declaratory relief.

Plaintiffs are interested in the manufacture and distribution of the "drug product called Krebiozen as an agent for use in the management of malignant tumors". Defendants are charged with administration of the Federal Food, Drug and Cosmetic Act, as amended. 21 U.S. C. § 355(a) prohibits the introduction of a "new drug" into interstate commerce unless an approval of a new drug application under § 355(b) (an NDA) is effective.

■ 21 U.S.C. § 335 calls for notice to a proposed defendant before a violation is reported to a United States attorney. Such notice was given to plaintiffs. Although § 335 also calls for an opportunity [1] administratively for presentation of views, it does not contemplate a proceeding leading to a final administrative order, subject to statutory judicial review. As a result of the notice, and, apparently, defendants' rejec-

---

1. Such opportunity is not a prerequisite to prosecution. United States v. Dotterweich, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943) rehearing den. 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492.

tion of views that sale of Krebiozen in interstate commerce required no effective NDA, plaintiffs brought this action. They sought a declaration (1) that Krebiozen is not a new drug by reason of the operation of a "grandfather" provision, enacted in 1962, in other words, that Krebiozen was commercially sold or used and not a "new drug" under the law just before the 1962 amendments, or, alternatively (2) that if Krebiozen was a new drug, one or more NDA's became effective, one in 1954 and one in 1961.

Each side moved for summary judgment. The district court entered judgment that "Krebiozen is now and has always been a new drug within the meaning of the statutory definition for which no approved New Drug Application is now or has ever been effective." Findings and conclusions are reported at 327 F.Supp. 386. Plaintiffs appealed. We affirm.

Since summary judgment was granted, the questions on appeal are whether there was no genuine issue as to any material fact and whether the propositions declared were correct as a matter of law.

Plaintiffs' alternative claims, that of grandfather clause exemption because Krebiozen was not a new drug under the 1938 law, and that of an effective NDA under the 1938 law are inconsistent. Although plaintiffs chose to press the grandfather clause claim first, chronology makes it more logical to take up their claims in the opposite order.

I. *The 1954 and 1961 NDA's.*

Plaintiffs' activity in the United States with Krebiozen, previously unknown, began in 1949–1951. Undeniably it was then a new drug as defined in sec. 201(p) of the 1938 act, 52 Stat. 1040, then in force. Under sec. 505(a), unless an NDA was on file and effective, a new drug could not be introduced into interstate commerce except under regulations covering solely investigational use.

On April 15, 1954, consistently with the new drug status of Krebiozen, plaintiff Marko Durovic tendered an NDA. On May 25, 1954, the Secretary replied by letter stating that the application was incomplete in two particulars and accordingly that it may not be filed.

Plaintiffs contend that this NDA became effective by operation of law, 60, or at most 180, days after receipt. They rely on sec. 505(b) and (c). If this NDA were deemed an application filed when received, within the meaning of (b), (c) would indeed cause it to become effective on the sixtieth day after the filing unless postponed by the Secretary to a time not more than 180 days after filing. Clearly there were no notice and hearing under (d) which would support an order refusing to permit the NDA to become effective, nor under (e) which would support an order suspending effectiveness.

Defendants' position is that a document purporting to be an NDA, received, but deemed incomplete, is not a filed application under (b), so as to become effective by lapse of time under (c).

Sec. 701(a) vested authority in the Secretary to promulgate regulations for the efficient enforcement of the act. In 1954, 21 C.F.R. § 1.110 provided that an application shall not be accepted for filing if incomplete on its face by omission of required material, and called for notice to the applicant. We consider the regulation a reasonable means of determining the fact and time of filing an application and preventing the triggering of the automatic operation of the statute where an intended application is incomplete under the statute. Notice of incompleteness, conforming to the regulation, was given. It does not appear either that Durovic amended the application so as to supply the omitted information, which would, under the regulation, have resulted in a filing date at the time of receipt of the amendment, if then complete, or that he challenged the refusal to accept for filing in any legal proceeding.

On March 27, 1961, Dr. Stevan Durovic, another plaintiff, submitted another NDA. This act was consistent with continued new drug status of Krebiozen. The application was supplemented March 31 and April 13. On May 23, 1961, the Director of the Division of New Drugs replied by letter stating that the application as amended was regarded as received April 13, that a preliminary review showed the NDA was incomplete in specified areas, but that there would be a further letter. On June 9, the Director wrote an eight page letter listing areas in which the NDA was incomplete and inadequate, and stating that, accordingly, it may not be filed.

The applicable regulation at this time was 21 C.F.R. 130.5. It was similar to the earlier one in all material respects, but also provided a procedure whereby the applicant, if he disputed the finding of incompleteness, could request filing over protest, and thus set the statutory machinery in motion. There is no claim that Dr. Durovic made such request.

We consider the regulations valid and that the agency complied with them. Accordingly we conclude that neither the 1954 nor 1961 NDA was a filed application so as to cause it to become effective by operation of law with lapse of time.

## II. *The "grandfather" claim.*

Until 1962 the controlling definition of a new drug depended upon the lack of general recognition among experts that it was "safe" for use according to its labeling. The Drug Amendments of 1962 [2] enlarged the required general recognition to "safe and effective". 21 U.S.C. § 321(p), as amended in 1962, reads in material part:

"(p) The term 'new drug' means—

(1) Any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety *and effectiveness* of drugs, as safe *and effective* for use under the conditions prescribed, recommended, or suggested in the labeling thereof, . . . or

(2) Any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety *and effectiveness* for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions." (We have italicized the words added by the Drug Amendments of 1962. All the other material quoted appeared in the 1938 act.)

The Drug Amendments of 1962 were approved October 10, 1962. Sec. 107(c)(4), 76 Stat. 789, a grandfather clause, provided:

"In the case of any drug which, on the day immediately preceding the enactment date, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section [321(p)] of the basic Act as then in force, and (C) was not covered by an effective [NDA] the amendments to section [321(p)] made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day."

The basic argument on behalf of plaintiffs is that on October 9, 1962, Krebiozen (A) was commercially used and sold in the United States, (B) was generally recognized as "safe" in the sense that it was non-toxic, and (C) was not, assuming their alternative argument be rejected, covered by an effective NDA. The basic argument of the government is (1) that, properly construed, the law before the 1962 amendments defined a drug which was to be used for treatment of a life-threatening disease as a new drug unless generally recognized as effective as well as otherwise safe; (2) that Krebiozen was not so recognized; (3) that its composition

2. P.L. 87–781, 76 Stat. 780.

was not sufficiently known to enjoy general recognition as "safe" even in the narrow sense; *i. e.*, non-toxic; and (4) that since Krebiozen was sold only for investigational use, it was not commercially used or sold within the meaning of the grandfather clause.

Activities of plaintiffs have been inconsistent with their present claim that Krebiozen had become a "recognized" rather than a "new" drug by October 9, 1962. The presentation of an NDA in 1954 and in 1961 implied that Krebiozen was a new drug on those dates. In June, 1963, plaintiff Stevan Durovic submitted a "Notice of Claimed Investigation Exemption" (IND) which, although withdrawn after a month, carried the same implication. In April, 1966, plaintiff Marko Durovic, under power of attorney for Stevan Durovic, wrote a letter to the FDA, which he referred to in the text as an "investigational drug application" and a "Notice of Claimed Investigation Exemption". Although this purported claim for investigational exemption noted that it was without prejudice to the status achieved by the earlier NDA's, it was inconsistent with the present claim that Krebiozen had, by October 9, 1962, ceased to be a "new" drug.[3]

Conceding that plaintiffs may not be irrevocably bound by their acts implying that Krebiozen had not become a "recognized" rather than "new" drug by October 9, 1962, nor by the assumptions in later judicial decisions that it was still a "new" drug, we proceed to analysis of the showings made on motion for summary judgment in the instant case.

*Grandfather requirement (A): "commercially used or sold" October 9, 1962.*

Defendants assert that all Krebiozen sold at or recently before the critical date was sold under a restrictive label, pursuant to 21 C.F.R. 130.3, *i. e.*, "An Agent for Investigational Use in the Management of Malignant Tumors . . . Caution—New drug limited by Federal Law to investigational use". If so labeled and sold only to a qualified expert who promised to investigate the safety of the drug, the shipment was exempt from 21 U.S.C. § 355(a) prohibiting introduction into interstate commerce of a new drug without an effective NDA.

██ There appears to be a dispute whether all sales of Krebiozen were expressly restricted by the seller to investigational use. There is room for question concerning the meaning of "commercially" in the grandfather clause. We assume, since Congress was endeavoring to avoid imposing new burdens on drugs which had already achieved "recognized" status, and usage thereunder to a material extent and for a material

3. Krebiozen has been involved in a number of judicial proceedings. (a) Durovic v. Palmer, 342 F.2d 634 (7th Cir. 1965). Plaintiff Stevan Durovic unsuccessfully sought to challenge certain federal investigations in June, 1963 of the preparation of Krebiozen. The opinion reflects at least an assumption that Krebiozen was then a "new" drug, "being distributed ostensibly for investigational use. . . ." (b) Ivy v. Katzenbach, 351 F.2d 32 (7th Cir. 1965), cert. den. 382 U.S. 958, 86 S.Ct. 437, 15 L.Ed.2d 732. Ivy unsuccessfully sought to enjoin prosecution under an indictment and requested a court supervised clinical test of the drug. The prosecution proceeded and resulted in acquittal, followed by conviction of a juror of criminal contempt for having brought extra-judicial information concerning Krebiozen to the attention of fellow jurors. See United States v. Bukowski, 435 F.2d 1094 (7th Cir. 1970). (c) Tutoki v. Celebrezze, 375 F.2d 105 (7th Cir. 1967). Although present plaintiffs do not appear to have been parties, this court said "The present posture of Krebiozen vis-à-vis the Food and Drug Administration (FDA) is that it is not approved under or exempted from section 505". (d) Rutherford v. American Medical Association, 379 F.2d 641 (7th Cir. 1967), cert. den. 389 U.S. 1043, 88 S.Ct. 787, 19 L.Ed.2d 835. Again present plaintiffs were not parties. This court said, however, "Krebiozen is unavailable in interstate commerce. As a new drug, it has not received an approval, required by the Food, Drug and Cosmetic Act, 21 U.S.C.A., § 355, which would permit its introduction into interstate commerce". p. 643.

time, that a gloss of openly and readily available and broadly distributed in the ordinary course of business as well as lack of restriction to investigational use was intended. Nevertheless we find it impossible to say, on the record presented, that defendants conclusively established that Krebiozen was not "commercially used or sold" as of October 9, 1962.

*Grandfather requirement (B): "generally recognized as safe" as of October 9, 1962.*

Defendants presented affidavits which, at least prima facie, established (1) that as of the critical date Krebiozen was not generally recognized among qualified experts as safe and effective for management of malignant tumors, and (2) that as of the critical date its composition was not sufficiently known to be recognized as safe in the sense of non-toxic, for use in such statement.

One affiant was Jesse L. Steinfeld, M.D., Surgeon General, United States Public Health Service. He described his professional background and attainments, much of them in the field of cancer research, and stated that he is well acquainted with the opinions of experts in the field of cancer, especially chemotherapy, and with the relevant literature and that he is well acquainted with Krebiozen.

Dr. Steinfeld stated: "I know of no medical school which teaches, or has taught, that Krebiozen is a treatment of cancer. I know of no hospital associated with a medical school where Krebiozen is used for treatment of cancer. I know of no expert in the field of cancer who believes now, or who has ever believed, that Krebiozen is safe for the treatment of cancer or that Krebiozen has any efficacy whatsoever in the treatment of cancer. . . . In 1963, I was a member of a committee of twenty-four cancer experts, selected from throughout the United States by the Director of the National Cancer Institute, who evaluated data on 504 patients submitted by Krebiozen's sponsors. I personally reviewed thirty-nine of the cases and participated in the review of many of the others. The Committee unanimously concluded that there was no substantive evidence in the data to demonstrate that Krebiozen was of any value whatsoever in treating cancer. . . . Based on my professional education, training, and experience, on my knowledge of published scientific literature, and in my contact with colleagues, it is my opinion that the composition of Krebiozen is such that I do not recognize it, nor is it generally recognized by experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe or effective when used for the treatment of cancer in the manner suggested in its labeling. The drug has never been so recognized."

Another affiant was Carl G. Baker, M.D., Director, National Cancer Institute, United States Public Health Service. He described his professional background and attainments, and substantial experience and expertise in the field of cancer, especially in the area of chemotherapy. He asserted similar opinions with respect to general recognition of Krebiozen.

With respect to the lack of general knowledge of the composition of Krebiozen as of October 9, 1962, Dr. Steinfeld and Dr. Baker each stated as follows:

"The actual composition of Krebiozen was not known to any expert in the field of cancer until 1963, when the Department of Health, Education, and Welfare released information concerning assays of the drug's composition. To my knowledge no meaningful scientific bioassay data on Krebiozen has ever been available to experts. Experts in the field of cancer, lacking information about a drug's composition or about its biological activity, could not have made a determination prior to 1963 concerning the safety of this drug".

Plaintiffs submitted the affidavits of Andrew C. Ivy, M.D. and Marko Durovic. Although they presented material

to support a claim that Krebiozen is thought by some physicians to be safe and effective in the treatment of cancer, they by no means asserted that it is generally so recognized among experts.

Dr. Ivy described his very impressive qualifications and experience as a physician, teacher, and author. He asserted that he had studied Krebiozen in collaboration with plaintiff Stevan Durovic, had treated hundreds of patients with Krebiozen and "analyzed and reviewed the observations and experiences of more than 3000 licensed physicians who have treated about 4227 patients, most of whom were afflicted with advanced or hopeless cancer". He asserted that Krebiozen is non-toxic, that it "is a tissue hormone, which functions and an anti-cancer substance". He asserted changes observed or reported in large numbers of the patients referred to. He concluded: "In my opinion, as an acknowledged expert on cancer and on Krebiozen, and based upon my own personal experiences and the experience of some 3000 licensed physicians whose results have been studied by me, Krebiozen is safe and beneficial in the treatment of cancer, and possesses significant palliative, arresting and remissive action on human cancer".

Plaintiff Durovic asserted no medical nor scientific qualifications. His affidavit was divided into eight parts, as follows:

1. *"Krebiozen is not creatine"*. (HEW has at times, beginning in September 1963, announced that ampules of Krebiozen contain mineral oil and some but not all contain a readily available and inexpensive laboratory substance known as creatine.) Affiant stated that creatine monohydrate is an impurity, associated in the ampule with a yellowish material or oil, a complex structure the components of which would require 10 years of effort to identify. He asserted that in the criminal trial it had been proved that Krebiozen was not mere creatine monohydrate, and referred to the testimony of various witnesses on that issue.

2. *"Krebiozen is effective in the treatment of cancer"*. Affiant asserted what he considered inadequacies in the qualifications, procedure, and standards of the committee of 24 referred to by Dr. Steinfeld.

3. *"Krebiozen is effective in the treatment of advanced and hopeless cancer cases"* Affiant stated that a hospital in Philadelphia and a number of physicians have treated patients with Krebiozen. He summarized or related certain testimony of Dr. John Pick who had seen cancer patients experience favorable results after treatment with Krebiozen and who stated that "it is of great help in the management of cancer".

4. *"The Affidavit of Marion I. Finkel, M.D., Deputy Director Bureau of Drugs of FDA"*. Affiant pointed out that this affidavit, asserting certain announcements by FDA, did not establish the announcements were true.

5. *"The Affidavit of Joseph Levine"*. Affiant asserted certain facts which he said renders Levine's determination of the composition of Krebiozen inadequate.

6. *"The Affidavits of Dr. Jesse L. Steinfeld and Dr. Carl G. Baker"*. Affiant asserted various facts on the basis of which he said their affidavits lack probative value.

7. *"The Affidavits of Levine, Finkel, Baker, and Steinfeld"*. Affiant asserted Dr. Scott Anderson and Dr. Walter McCrone had established that Krebiozen was not creatine monohydrate, and that in the criminal trial defendants were acquitted because of the government's failure to prove that Krebiozen is creatine monohydrate or that ampules labeled Krebiozen and containing mineral oil, lacked Krebiozen powder.

8. *"Krebiozen is safe and not toxic"*. Affiant stated that Krebiozen is not toxic, and that this was proved by statements of physicians who had administered thousands of injections, Dr. Ivy's observations, Dr. Pick's testimony that he had been injected with 100 ampules without ill effects, and the report to

that effect of the Philadelphia hospital after treating 40 patients.

■ It must be remembered that the issue presented under the applicable law is not whether Krebiozen is in fact non-toxic, nor in fact effective, nor whether some physicians or experts could be found who considered it so, but solely whether by October 9, 1962, it had achieved general recognition among the experts as safe for the management of malignant tumors, as the term "safe" was then properly interpreted.[4] It is clear that neither Dr. Ivy's affidavit nor the reports and opinions of others, reported by Durovic's affidavit, purported to assert that Krebiozen had, as of October 9, 1962, achieved general recognition among experts as safe or safe and effective.

Analytically, it is plausible to argue that the addition by Congress of "effective" to the standard by which drugs were to be judged on and after October 10, 1962, meant that effectiveness was not part of the standard before that date, when only "safe" appeared. On the other hand, it is clear that those responsible for the change understood that "The Food and Drug Administration now requires, in determining whether a 'new drug' is safe, a showing as to the drug's effectiveness where the drug is offered for use in the treatment of a life-threatening disease. . . . In such cases, the determination of safety is, in the light of the purposes of the new drug provisions, considered by the Food and Drug Administration to be inseparable from consideration of the drug's effectiveness. The provisions of the bill are in no way intended to affect any existing authority of the Department of Health, Education, and Welfare to consider and evaluate the effectiveness of a new drug in the context of passing upon its safety".[5]

The thinking behind the position referred to is illustrated in the Steinfeld and Baker affidavits, as follows: "The use of an ineffective drug such as Krebiozen for the treatment of a life-threatening disease such as cancer is not a safe medical practice. Any delay in the institution of effective therapy (e. g., radiation, surgery, effective chemotherapy) caused by the use of an ineffective drug allows the disease to progress beyond control. Delay means almost certain death".

■ Bearing in mind the weight properly accorded to administrative construction, and Congressional awareness of the administrative view that the concept of safety in the law before the 1962 amendments included the concept of effectiveness for its indicated use where the drug is offered for use in the treatment of life-threatening disease, we think the definition of new drug before the amendments should be construed accordingly. It would follow that a drug offered for use in the treatment of cancer is now, and was before the amendments, a new drug unless it has achieved general recognition among the experts as safe and effective for such use.

■■ Under that analysis, the status of a drug offered for such use would be subjected to the same test before and after the amendments, and the grandfather clause would have no effect on it.[6]

■ Applying the reasoning just stated, the declaratory judgment was clearly correct. The affidavits demonstrate, beyond any issue of fact, that

4. United States v. Seven Cartons, More or Less, etc., 424 F.2d 1364 (7th Cir. 1970) ; Tyler Pharmacal Distrib. Inc. v. U. S. Dept. of Health, E. & W., 408 F.2d 95, 99 (7th Cir. 1969) ; AMP Incorporated v. Gardner, 389 F.2d 825, 831 (2d Cir. 1968).

5. Senate Report No. 1744, July 19, 1962, 1962 U.S.Code Congressional and Administrative News, p. 2891.

6. In any event a grandfather clause exception is to be construed strictly against one who invokes it. United States v. Allan Drug Corporation, 357 F.2d 713, 718 (10th Cir. 1966) cert. den. 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131.

Krebiozen has not, either before or after October 9, 1962, achieved general recognition among qualified experts as safe and effective for use in the management of malignant tumors.

If, however, we are in error in such reasoning, an alternative path also leads us to affirm the judgment. Assuming *arguendo* that even for drugs intended for treatment of life-threatening disease, "safe", before the 1962 amendments, meant only non-toxic, the affidavits have established that, as of October 9, 1962, the identity and composition of Krebiozen was so completely unknown that it could not, for that reason, have been generally recognized among qualified experts as safe, even in the narrow sense, for its indicated use.

We have been made aware, in this record, of much of the emotionally charged controversy about Krebiozen. Some characterize Krebiozen as a hoax, yet there are many who believe with deep sincerity that a number of cancer sufferers have been aided, or even saved, by it. Its advocates contend that the medical "establishment" both in and out of government has unfairly denied Krebiozen a reasonable test. So distinguished a person as the Honorable Paul Douglas, former Senator from Illinois, has taken its part. Some would argue that if a substance is found to be innocuous, a sufferer who hopes it will relieve him is entitled to have it.

The issues suggested by the last paragraph, however, are not before us for decision.

The law, as Congress enacted it, looks primarily to the administrative process for deciding which new drugs meet appropriate standards for introduction into interstate commerce. That process is to protect the public through granting, denying, and suspending the effectiveness of NDA's. Administrative decisions are subject to judicial review within the appropriate limits. Realizing, however, that there were already on the market,

or might come to be, drugs offered to the public which already were, or would be, so clearly recognized as safe (before the 1962 amendments) or as safe and effective (thereafter) that subjecting them to the administrative process would be unnecessary and wasteful, Congress allowed them to bypass the NDA procedure. We think the standard of general recognition by qualified experts was intended to be strictly construed so that unless a drug is clearly entitled to proceed through the direct channel, it must proceed through the NDA channel.

Interpreting the law in the light of its purpose [7] we are convinced that neither as of October 9, 1962, nor since, has Krebiozen achieved the extent and type of general recognition that entitles a drug to short-circuit the NDA procedure.

The judgment appealed from is affirmed.

---

7. United States v. Dotterweich, *supra*, fn. 1, p. 280.