**Marko DUROVIC, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 76-1380.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1976.

Decided Oct. 21, 1976.

Edward J. Calihan, Jr., Anna R. Lavin, Chicago, Ill., for petitioner-appellant.

Scott P. Crampton, Asst. Atty. Gen., Michael L. Paup, Atty., Tax Div., Dept. of Justice, Meade Whitaker, Washington, D.C., for respondent-appellee.

Before SPRECHER and WOOD, Circuit Judges, and WOLLENBERG, Senior District Judge.*

SPRECHER, Circuit Judge.

The salient issue in this appeal is the proper method of converting Argentine pesos into United States dollars for income tax purposes. What appears to be a simple question has so far required two Tax Court decisions and two appeals to this court.

I

This income tax case is another chapter in the history of the controversial drug Krebiozen,[1] developed by Dr. Stevan Durovic, and financed in part by his brother, Marko Durovic, the appellant-taxpayer in this case.

The Tax Court originally entered its decision on April 20, 1972, in accordance with its opinion in 54 T.C. 1364, filed on June 24, 1970. This court affirmed most of the Tax

---

* Honorable Albert Charles Wollenberg, United States Senior District Judge of the Northern District of California, is sitting by designation.

1. *See for example, Durovic v. Palmer,* 342 F.2d 634 (7th Cir. 1965); *Durovic v. Richardson,* 479 F.2d 242 (7th Cir. 1973), *cert. denied,* 414 U.S. 944, 91 S.Ct. 232, 38 L.Ed.2d 168 (1973).

Court's findings and conclusions, in *Durovic v. Commissioner of Internal Revenue*, 487 F.2d 36 (7th Cir. 1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974), but remanded the case to the Tax Court (1) "for further exploration of the law and fact, and a proper determination" of the issue of the applicable conversion rate of exchange, and (2) "to determine whether the taxpayer is to get a deduction for the cost of the 63,903 free ampules distributed as an advertising expense or as an amortizable good will expense." 487 F.2d at 44, 48.

The Tax Court entered its decision on remand on February 23, 1976, in accordance with its opinion in 65 T.C. 480, filed on December 3, 1975, holding (1) that the conversion rate of exchange was nine Argentine pesos per United States dollar, and (2) that the free distribution of 63,903 ampules was a capital expenditure in the nature of good will and the taxpayer, having failed to establish a useful life over which such expenditure could be amortized, was not entitled to a deduction with respect thereto.

## II

Marko Durovic, while a resident of Argentina, acquired two grams and 35 centigrams of Krebiozen, from Juan Manuel Tanoira, also a resident of Argentina, on January 26, 1950, for 3,005,000 Argentine pesos, after borrowing 2,000,000 pesos from the Argentine banking house of Armando Ferrari. On February 7, 1950, Marko brought this property into the United States as a biological product without the payment of duty to the United States and contributed it as his investment in an equal partnership with Stevan.

The two grams, 35 centigrams of Krebiozen were later manufactured into 200,000 ampules of Krebiozen, the cost of which the Tax Court found to be 3,005,000 Argentine pesos. The amount of the cost of goods sold must be measured in, and hence converted to, United States dollars for the practical reason that the Durovic brothers filed United States partnership returns for the years 1954–1958 in which, of course, the amounts received for the sale of Krebiozen ampules in the United States were expressed in United States dollars. According to the Tax Court's determined rate of exchange of nine pesos per United States dollar, the cost of the goods sold would be $333,888, resulting in a substantially greater income tax eventually due than if Marko's contention before the Tax Court and on this appeal that the proper rate of exchange should be 3.36 pesos per dollar (in which case the cost of goods sold would be $894,345) should prevail.

The taxpayer relies upon the rate of exchange established by 31 U.S.C. § 372, which reads in pertinent part:

(b) For the purpose of the assessment and collection of duties upon merchandise imported into the United States . ., wherever it is necessary to convert foreign currency into currency of the United States, such conversion . . . shall be made at the values proclaimed by the Secretary of the Treasury . . . .

(c)(1) If no value has been proclaimed . . .

(A) at a value measured by [the] . . buying rate . . . .

\* \* \* \* \* \*

(2) . . . the . . . "buying rate" . . . shall be determined by the Federal Reserve Bank of New York and certified to the Secretary of the Treasury . . . .

Taxpayer's expert witness, Max L. Baughman, testified that in 1949, there was a strong relationship between Argentina and Great Britain because Argentina shipped a substantial amount of meat to Great Britain. When the British devalued the Sterling pound on September 18, 1949, it "threw the currency exchanges in Argentina in an uproar and they had to suspend all trading until October the 3rd," on which date the Argentine Central Bank published a list of seven rates, three for importation and four for exportation—the basic rate, Preferential A, Preferential B and a special rate.

According to taxpayer's Exhibit 76, on August 29, 1950 the Argentine Finance Ministry announced a simplified exchange rate system, whereby a "Preferential" rate replaced Preferential A and Preferential B, and the special rate was discontinued. Exhibit 76, which constitutes the buying rate in New York, certified by the Federal Reserve Bank of New York to the Secretary of the Treasury in accordance with 31 U.S.C. § 372(c)(2), specifies a January 1950, basic buying rate of 29.778 cents per Argentine peso, or 3.3582 pesos per dollar. However, a footnote explains that up to August 29, 1950, the basic rate existed in conjunction with the three other rates (Preferential A, Preferential B and Special) and "for quotations on the discontinued rates, see [Federal Reserve] Bulletin for October 1950, p. 1419."

Consequently, on the crucial date involved in this case—January 26, 1950—there existed at least four different buying rates of exchange for Argentine pesos. This was not necessarily an unusual situation. In *Barr v. United States*, 324 U.S. 83, 90, 65 S.Ct. 522, 89 L.Ed. 765 (1944), the Supreme Court noted that "[d]ual or multiple exchange rates have resulted in recent years from measures for the control and restriction of foreign exchange and export transactions." Hence, the Court concluded that it would violate Congressional purpose to conclude "that on a given date only one buying rate for a specified foreign currency could be certified by the Federal Reserve Bank of New York or proclaimed by the Secretary of the Treasury." *Id.* at 89–90, 65 S.Ct. at 524, 525.

The four official Argentine rates in effect on January 26, 1950, were:

| | |
|---|---|
| Basic | 3.3582 |
| Preferential A | 4.8321 |
| Preferential B | 5.7286 |
| Special | 7.1964 |

pesos per United States dollar.

Mr. Baughman concluded that the rate of conversion in this case should be the basic buying rate of 3.36 pesos per dollar. He based his conclusion primarily on Exhibit 76 and on the controlling assumption that an "export product" was involved. The credibility of Baughman is immediately suspect, however, since even if an export product was involved, Krebiozen was a biological product derived from the blood serum of horses, an item which was not expressly listed under any of the four official Argentine rates. Taxpayer's own exhibit unambiguously states that if a product is not listed, it shall be subject to Preferential Rate A, which was 4.8321 pesos per dollar, instead of 3.36 pesos (Pet. Ex. 78).

The basic buying rate of 3.36 pesos is subject to a greater infirmity, however. 31 U.S.C. § 372(b) clearly states that the buying rate therein established is "[f]or the purpose of the assessment and collection of duties upon merchandise imported into the United States . . . ." In *Barr v. United States, supra* at 93, 65 S.Ct. at 526, the Supreme Court said that "[i]t hardly need be pointed out . . . that our decision [interpreting § 372], like [§ 372(c)], is concerned *only* with the assessment and collection of duties upon imports through the use of a formula which Congress designed" (emphasis added).

The taxpayer entered the United States on February 7, 1950, bringing the two grams, 35 centigrams of Krebiozen with him. He declared and identified what he carried as a biological product and by its weight, but not by any value (Tr. 638, 834–37). He did not declare a dollar value because as he said "Krebiozen could have value or no value . . . [depending] on the effect of the drug." (Tr. 836). No duty was assessed on the Krebiozen by the United States because it was considered a biological product not subject to any duty (Tr. 835). Thus the entry of the product into the United States was effected without the application of the buying rate established by 31 U.S.C. § 372(c) or any other rate inasmuch as there was no "assessment or collection of duties" and no value whatsoever was ascribed to the Krebiozen. Applying taxpayer's contention to its ultimate conclusion, the cost of goods sold for income tax

purposes would be zero and taxpayer's deficiency would be far greater than that computed by the Tax Court decision.

However, the Tax Court found that it would give some weight but not controlling weight to the four official or basic buying rates established in accordance with 31 U.S.C. § 372(c). The Court ultimately found and concluded that the taxpayer's acquisition of the Krebiozen had no relation to its export from Argentina or its import into the United States, but was an entirely separate and different transaction unrelated to the subsequent taking of the product out of Argentina. The Tax Court denominated the acquisition a financial transaction as opposed to a commercial export-import transaction. The terminology is less important, however, than the nature of the transaction.

We have noted that the transaction involving the removal of the Krebiozen from Argentina into the United States resulted in a declaration by the taxpayer to United States custom officials that the product was biological and of no dutiable value. Looking at the removal transaction more closely, we further find that it entailed no apparent tax or duty by Argentina either.

The taxpayer also brought about $200,000 in cash with him to the United States, having obtained dollars for pesos in Montevideo, Uruguay, on what he called the "free market." At that time, one could take money out of Argentina only with government permission and that permission was difficult to obtain. Taxpayer testified that "my brother had some connection . . . the mother-in-law of a very important person was using the drug Kositerin [another drug developed by Stevan Durovic]" and Stevan was able to obtain government approval for Marko to bring the $200,000 out of Argentina (Tr. 802–07, 834). Inasmuch as the taxpayer introduced no evidence that the supply of Krebiozen was taxed in any way as the price of getting it out of Argentina, it can be assumed that there was no Argentine duty imposed on the removal of the supply from Argentina to the United States. So again, if we concentrate on the

removal transaction, the taxpayer would fare worse than the Tax Court has determined.

Consequently, what the Tax Court focused upon and what we now focus upon in setting the cost of goods sold is not the removal or export-import transaction, but the prior financial transaction in which the taxpayer paid 3,005,000 Argentine pesos to Tanoira. As we shall discover, this transaction had no relation whatever to the taxpayer's removal of the drug to the United States.

Tanoira, who had invested 2,997,500 pesos in Krebiozen in return for a right to fifty per cent of the profits and who held the two grams, 35 centigrams as security for his investment or as he testified which "I kept as a guarantee," became "no longer interested in continuing with the venture because it was really outside my field and Dr. Durovic had left for the United States." Therefore, by the written agreement dated January 26, 1950 (appearing in 54 T.C. at 1374–75), Tanoira testified "Mr. Marko Durovic, with the authorization of Dr. Stevan Durovic returned my capital to me" and "I also handed in the . . . product which I kept as a guarantee, about two grams thirty five centigrams" (Pet. Ex. 60).

It can be seen from the record that the supply of Krebiozen was owned in Argentina by Dr. Stevan Durovic and that Tanoira, having supplied most of the financing up to 1950, had a possessory lien on the supply of the drug. When Tanoira desired to liquidate his investment, the taxpayer stepped in and paid off Tanoira in order to release the drug from the lien. This constituted a financial transaction with one investor being supplanted by another and the product owned by a third party being released from a lien. This transaction bore no necessary relation to the drug's removal to the United States.

The taxpayer testified that when he came to the United States on February 7, 1950, he arrived "with the aim to return to Argentina . . . but then developed the controversy with Krebiozen, so I stayed then" (Tr. 638; *see also* 640). After he

arrived he continued to operate, as a partner with Stevan, a laboratory for the production of Krebiozen in Argentina until 1956, six years after his entry into the United States (Resp. Ex. AK; Tr. 471–72). Consequently, when he dealt with Tanoira, the taxpayer could have as conveniently left the supply of Krebiozen in Argentina as taken it to the United States.

Mr. Baughman testified that the First National Bank of Boston had branches in Argentina and "had a reputation for being very strong in South America."

The Commissioner called as an expert witness a vice-president of the First National Bank of Boston, William G. Oliver, Jr., who testified that he was the bank's resident expert on Argentine matters and controlled many of the operations of the Argentine branch of his bank; that the First National Bank of Boston first opened an Argentina branch in 1917 and employed about 1,000 persons there in 1950; that the only other United States bank with an Argentine branch in 1950 was National City Bank of New York; that his bank is consulted by other banks around the world in regard to Argentine matters; and, that he was personally and permanently stationed in the Argentina branch for 20 years from 1949 to 1968. He testified that Argentina had a multiple rate system beginning in October 1949, "set up purely for the convenience of the [Argentina] Government to not disrupt the internal economics of the country." Argentina also had a free or financial rate of approximately nine pesos to the dollar. Anything which was not listed as qualified for the official rate was exported under the financial rate, but the transaction would require Argentine Central Bank approval. In a sense, the financial rate was also "official" inasmuch as all foreign exchange in Argentina between pesos and any foreign currency had to be reported to the government and had to be consummated at the rate approved by the government.

The Commissioner introduced a letter from a vice-president of the First National Bank of Chicago stating that "our records reflect that on January 26, 1950, the 'interbank' rate for the Argentine peso was 11.2 cents per peso" and "[t]ransactions between banks and commercial customers were based on this rate." This rate would convert into 8.92 pesos per dollar. Similarly, Richard M. Kates testified that he had been employed by the Chief Counsel of Internal Revenue Service in 1968; that in connection with this case and in order to stipulate with taxpayer's counsel as to official and commercial rates, he at that time copied from daily newspaper reports of foreign exchange contained in the files of the First National Bank of Chicago the Argentine rates there shown; and, his written memorandum shows, among other things, that the Argentina peso was valued at 11.20 American cents on January 3, 1950 and on February 6, 1950. Based on these and other figures, the parties had stipulated to the Tax Court prior to the remand by this Court that the official rate of exchange in 1950 was 3.36 pesos to one dollar and that the commercial rate was 9.66 pesos to one dollar. The stipulated rates were based on a yearly average, but the dates closest to January 26, 1950, showed that the commercial rate at or about that date was 8.92 pesos per dollar.

The Commissioner also introduced a telex message to Mr. Oliver from the manager of the Argentina branch of First National of Boston dated January 24, 1975, stating that on January 26, 1950 "the official free rate, apparently covering all other financial transactions, was 9.01" pesos per dollar; the official basic exchange rate for exports was 3.36, while the preferential rates were 4.83, 5.73 and 7.20 pesos per United States dollar.

Mr. Oliver was questioned about three possible molds which the financial transaction of 3,005,000 pesos could take in order for the taxpayer to derive some cost for his goods sold. The first situation was posed as follows:

Q. How about transactions between citizens or residents of Argentina, involving products originating in Argentina, and conducted in terms of Argentina pe-

sos? What rate would be applicable to that type of a situation?

A. It's not applicable in any case, whatsoever. You were working within the country, you were buying and selling amongst—one man to another—he sells in pesos. He may be thinking, well, this is worth so many dollars, and puts a peso value on it, but there is no exchange rate applicable to a sale from one person to another in the country in pesos.

The second situation about which Mr. Oliver was questioned was as follows:

Q. All right. Now, going back to January of 1950, at what rate of exchange would your bank have applied to a transaction where someone applied to your bank for a conversion of one dollar into pesos?

A. If I understand, you're asking me if somebody came into our branch in Buenos Aires?

Q. Yes, with dollars and they wanted to purchase pesos.

A. If they had a dollar bill, we would give him somewhere around this nine rate. . . .

Finally the third situation posed to Mr. Oliver was as follows:

Q. Let's assume another situation. Suppose I, residing in the United States, went to your bank in Boston and purchased a draft payable in pesos to an individual residing in Argentina. Now, at what rate of exchange would have been applicable in connection with that transaction?

A. For a transaction of that type, you would get nine pesos, approximately—around the level of nine, with a few centavos one way or the other—for each dollar. Any transaction of that type could go into the country at that time—they were very free to accept foreign currency to help build up the country, so they were not as curious or tight about money coming into the country—they would allow the money to come in. But, once the money came down there, there was no system whereby you could buy back your dollars afterwards. In other words, if you sent dollars—sent money down there and gave a person pesos, he could not turn around and buy dollars at any rate and come out. He would then have to get in what is known as the black market, or the parallel market rate, which was an illegal rate that, at that time, ran around fifteen.

Q. All right, this—in my example, this person to whom I sent pesos, which I purchased in the United States at the rate—at the nine dollar rate you were referring to—consideration therefor was to export a certain product to me in the United States. Under the system as existed in January of 1950, what would have had to have been done then?

A. The man in Argentina could have received your transfer from the States. He would have picked up pesos down there at the rate of nine to the dollar. He could have made a purchase in Argentina for the export to you. He would go to the Central Bank and get a permit to export at X rate, whatever the rate—the product demanded—then he would make his shipment through normal channels, by ship, but before the product could leave the country, he would have to bring in the dollar equivalent of that. Your transaction of selling dollars had no connection with the fact that he was exporting. Two entirely different transactions. When he was exporting, so he had to bring dollars back into the country for the value of that export.

Finally, there is additional evidence in the record that on January 26, 1950, there existed in Argentina a rate that hovered around nine pesos for each United States dollar, characterized as a "free" exchange rate, which was the officially approved exchange rate for United States dollars. *See* Ex. AQ, *The Situation in Argentina,* Feb. 27, 1950, p. 3; Ex. AR, *The Situation in Argentina,* Oct. 31, 1949, p. 1; Ex. AS, First National Bank of Boston, Buenos Aires, Argentina telegram; Ex. AT, *International Financial Statistics,* III (Sept.1950), p. 141; Ex. AU, *International Financial Statistics,* IV (Feb.1951), p. 2; Ex. AV, *International*

*Financial Statistics,* III (Jan.1950), p. 20; Ex. AW, *Fortnightly Review* (Feb. 11, 1950), p. 21; Ex. AX, *Chicago Journal of Commerce,* cable quotations (Jan. 27, 1950); Ex. AY, *New York Times,* Foreign Exchange (Jan. 27, 1950).

■ The Tax Court's conclusion that "the proper rate of exchange to be employed in determining the value, in U.S. dollars, of M $ N 3,005,000, which petitioner paid for the powder, is the 'free' rate of nine pesos per U.S. dollar" is supported by substantial evidence in the record and is affirmed. The taxpayer failed to sustain the burden of proving the applicability of any other rate of exchange. *Weil v. Commissioner of Internal Revenue,* 150 F.2d 950, 952 (2d Cir. 1945).

### III

This court on the prior appeal remanded the case to the Tax Court "to determine whether the taxpayer is to get a deduction for the cost of the 63,903 free ampules distributed as an advertising expense or as an amortizable good will expense." No additional evidence was presented after remand with respect to the treatment of the 63,903 ampules which were distributed free of charge.

The Tax Court in its opinion after remand said at 65 T.C. 504–06:

It is not necessary under the circumstances of this case for us to decide what portion of the costs is allocable to goodwill and what portion is allocable to research and experimentation. To the extent the expenditures were for goodwill, they are nonamortizable as a matter of law. To the extent the expenditures were for research and experimentation, they are nonamortizable because no "reasonably" ascertainable useful life can be ascribed to them.

\* \* \* \* \* \*

. . . On the record before us, we cannot find that at the close of the year 1954 there was any reasonable way of estimating how long petitioner's business would benefit from these expenditures.

. . .

\* \* , \* \* \* \*

We do not deny that petitioner incurred a cost in distributing the 63,903 ampules free of charge. However, on the record before us we are unable to conclude that petitioner is entitled to amortize any portion of that cost.

■ In regard to the proposition that goodwill is nonamortizable, we agree with the statement made in *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1247 (5th Cir. 1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974):

Some intangible capital assets are, of course, nonamortizable as a matter of law, with the most frequently litigated example being the "goodwill" of an ongoing business. Treasury Regulation § 1.167(a)–3 specifically provides, "No deduction for depreciation is allowable with respect to goodwill," and the cases are consistent in applying that regulation strictly. *E. g., Winn-Dixie Montgomery, Inc. v. United States,* 5 Cir. 1971, 444 F.2d 677; *United States v. Cornish,* 9 Cir. 1965, 348 F.2d 175; *Dodge Brothers, Inc. v. United States,* 4 Cir. 1941, 118 F.2d 95. Indeed, this proposition is so well settled that the only question litigated in recent years regarding this area of the law is whether a particular asset is "goodwill."

In regard to the inability on the record before it for the Tax Court to ascribe a reasonably ascertainable useful life to these costs, we can only refer to another goodwill case, *Karan v. Commissioner of Internal Revenue,* 319 F.2d 303, 306 (7th Cir. 1963), where we said:

This court will give primary consideration to the conclusions drawn by the Tax Court which was the trier of the facts. Our own review of the record before us leaves us with the conviction that the Tax Court has committed no mistake here. We find substantial support for the findings of fact and for the conclusions of law drawn from them.

The decision of the Tax Court is affirmed.

Affirmed.