MAX ISENBERGH AND PEARL EVANS ISENBERGH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68525. Filed February 26, 1959.

*Nathan H. David, Esq.*, for the petitioners.
*Neil J. O'Brien, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1954 and 1955 as follows:

| Year | Deficiency |
| --- | --- |
| 1954 | $2,026.20 |
| 1955 | 1,271.25 |
| Total | 3,297.45 |

The issues presented for decision are (1) whether a Rockefeller Public Service Award is excludible in whole from gross income under

section 74(b) of the Code of 1954,[1] but if not excludible in whole from gross income under section 74, whether certain portions paid out by petitioners as expenditures for travel, research, and clerical help are excludible from gross income as expenses incident to a fellowship grant under section 117 of the Code of 1954; and (2) the value and useful life of certain household furnishings for the purpose of a claimed depreciation deduction.

The findings of fact and opinion with respect to each issue will be discussed separately.

## FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

### Issue 1.

Petitioners Max and Pearl Isenbergh are husband and wife. They filed joint income tax returns with the district director of internal revenue at Baltimore, Maryland, for the calendar years 1954 and 1955.

During 1953, and until June 1954, Max Isenbergh (hereinafter referred to as petitioner) was Deputy General Counsel of the Atomic Energy Commission. In November 1953, while petitioner was engaged in work concerning the establishment of an international organization to deal with the peaceful development of atomic energy, it occurred to him that it might be useful to examine existing international organizations cooperating in different areas to see what lessons could be drawn from them that might be helpful in establishing the prospective atomic energy agency. With this in mind, petitioner procured the announcements of the Rockefeller Public Service Award.

The Rockefeller Public Service Award (hereinafter referred to as the Award) program was established in 1952 by a grant to Princeton University from John D. Rockefeller 3d, and is administered by the university. It is designed to give special recognition to outstanding public service by civilians in the executive branch of the Federal Government and to establish incentives for the continuance and advancement of those in public service. When the program was first announced, Mr. Rockefeller stated that, in his opinion, it seemed imperative that every effort be made to encourage specially qualified citizens to enter Federal service as a career and to stimulate the sustained interest, growth, and development of those already in the service. The program is limited to Federal career employees whose performance has been distinguished by intellectual maturity, leader-

---

[1] All statutory references are to the Code of 1954.

ship, character, and competence, and who evidence a sincere interest in public service as a career.

The essential criterion is evidence of demonstrated value to the Government service and evidence of future value in terms of general promise and usefulness or in terms of specific future assignment.

The Awards were intended to be sufficient to enable each recipient, at no financial sacrifice to himself, to spend no less than 6 and no more than 12 months in residence at an institution of the individual's choice, or in some comparable educational activity. The maximum award available for the year 1954 was $17,500.

Persons became candidates for the Awards either by nomination of a Government agency or by direct application. When petitioner obtained the announcement in November 1953, the date for filing applications had already expired. Petitioner thereupon telephoned Princeton University and learned that the first meeting of the selection committee was scheduled for the following Tuesday or Wednesday. The selection committee was willing to accept his late application, and petitioner spent a feverish weekend preparing an outline of the program that he planned to undertake, filling out the application form, and contacting persons to serve as personal references. He submitted his application by mail on the following Monday.

In his application, petitioner stated the activities involved in his current position with the Atomic Energy Commission, the details of his past experience in positions with the Government in numerous capacities, including executive, judicial, and legislative functions, and his distinguished educational background. He also listed his contributions to legal publications and listed eminent references as to his character.

One part of the application required to be submitted in order for the candidate to receive due consideration was a proposed program of study upon which the applicant hoped to embark in the event he was chosen to receive the Award. The proposed course of educational activity was intended to have potential value, not merely to the individual but to the agency and/or the Government service as well.

Petitioner's proposed program, which was submitted as part of his application, was to make a study of—

the Schuman Plan, and time permitting, other existing forms of and organizations for international cooperation in Europe for such light as may be shed on the desirability, feasibility, and possible form of a supranational organization concerned with use of atomic energy for electric power and other peaceful purposes.

Petitioner requested that initiation of his program of study be postponed until the summer of 1954, since he was then presently engaged with proposed legislation involving the industrial application of atomic energy in the United States and desired to follow the career of the bill through the congressional hearings.

Petitioner proposed Paris as the most appropriate location for his headquarters since it is centrally located with respect to headquarters of other international organizations, and also because the United States Embassy there could make available research and stenographic facilities.

In the final paragraph of his proposed plan, petitioner stated:

The proposed program would bring many aspects of my past training and experience together for application to a project worthy of anyone's utmost devotion. Planning to remain in the Federal Service, I should be in a position to be useful to the Government, if only as a source of reliable information * * * bearing on important decisions related to the field of inquiry. This in itself, I respectfully suggest, is a sufficient justification for the project. I cannot refrain from expressing the hope, however, that the gleanings of this study would permit me to serve the Government for many years, affirmatively and creatively, in the cause of world peace.

Early in 1954, petitioner was notified that the selection committee had provisionally recommended that he be granted an Award for the purpose of pursuing his proposed year's study of the Schuman Plan and other forms of international cooperation. Petitioner was one of many applicants for the Awards and the competition was keen. The fact that he was one of the few recommended from so many was recognition of the quality of his past performance and was a mark of confidence in his future value to the Federal service. The Award was provisionally made so that the recipient would have an opportunity to accept or decline. Petitioner accepted the Award.

Petitioner's Award carried the maximum sum of $17,500 which was intended to cover both the equivalent of his then salary and necessary expenses. He was entitled to elect payment in whatever manner he chose. Generally, recipients requested that the part of the Award considered equivalent of salary be paid in monthly installments, and that the expense portion be paid in three or four payments, depending on the individual's program.

Petitioner chose to and did receive $3,500 in April 1954. The request for this amount was to cover the immediately predictable expenses to be incurred in connection with his proposed plan of study. He requested and did receive $1,100 per month for 12 months, commencing in July 1954 and ending in June 1955, and the balance of $800 on conclusion of his program of study in 1955. At the time petitioner accepted the Award he was receiving $1,100 per month as compensation from the Atomic Energy Commission, which totaled $13,200 a year.

Pursuant to his plan, petitioner, accompanied by his family, went to Paris in July 1954, where they remained until June 1955. While in Europe, petitioner traveled to England, Switzerland, Italy, and Luxembourg, carrying on studies and interviewing appropriate experts with reference to the problems involved in organizing an inter-

national institution to deal with the peaceful development of atomic energy.

Petitioner incurred, on behalf of himself and his family, traveling expenses from the United States to Europe, in Europe, and back to the United States, in the following amounts:

|  | 1954 | 1955 |
|---|---|---|
| Washington to Paris | $1,800.00 |  |
| Hotel for 3 weeks (Paris) | 753.75 |  |
| In England and on the Continent | 1,475.00 | $920.35 |
| Paris to Washington |  | 1,933.50 |
|  | 4,028.75 | 2,853.85 |

Petitioner incurred the following additional expenses in connection with his plan of study:

|  | 1954 | 1955 |
|---|---|---|
| Stenographic | $240.80 | $74.75 |
| Entertaining contacts in relation to project | 200.00 | 95.00 |
| Books and periodicals | 198.65 | 62.40 |
|  | 639.45 | 232.15 |

Petitioner paid rent of $400 a month for an apartment while in Paris. One of the rooms in the apartment was a study wherein petitioner performed the major portion, outside of traveling, of the work connected with his research project. The work consisted of interviewing various persons from whom information was solicited, and the writing of materials connected with his program of study.

The room was used by petitioner for personal as well as business entertaining, and petitioner's children used the room from time to time. The amount of the monthly rental attributable to the study, which was incidental to the project, was $75 per month, or $450 in each of the years in question.

At the time petitioner submitted his program of study, he had every intention of carrying it out. He requested leave from his Government position with the Atomic Energy Commission on the basis of having received the Award. Petitioner was not a candidate for a degree at the time he received the Award.

It was clear to petitioner when he applied for the Award that even if he received the maximum amount of $17,500, he could not have completed his project without some financial sacrifice, in view of the fact that his anticipated, necessary expenses would exceed the difference between the amount of the Award and his then salary of $13,200.

Petitioner was not nominated by a governmental agency to receive an award. He became a candidate therefor and was selected as a

result of a direct application prepared and filed by him, accompanied by a proposed program of study.

The Rockefeller Public Service Awards Committee anticipated that petitioner would incur certain necessary expenses in the carrying out of his program of study.

Respondent determined that the Rockefeller Public Service Award received by petitioner was a fellowship grant.

Petitioner's expenditures as found above represent expenses incident to a fellowship grant.

### Issue 2.

Petitioner owned a house in Washington, D.C., which he rented furnished during his absence in Europe. The value of the house at the time he rented it in June 1954 was $30,000. The useful life of the house at the time he rented it was 25 years.

In his returns, petitioner claimed a depreciation on the furnishings based on a useful life of 5 years and placed a value thereon of $10,000. In his petition, he claimed that the value of the furnishings was $11,925. Petitioner received rent of $1,275.40 for the house in 1954 and $1,900 in 1955. Petitioner valued the furnishings and based his claim for 20 per cent depreciation on the basis of his own personal experience. He had never been employed to evaluate furnishings. He did not contact any used furniture dealers or anyone else with special knowledge of used furniture values or depreciation thereon for the purpose of fixing a valuation or depreciation on any item of the furnishings.

Petitioner failed to prove error in respondent's determination that the furnishings had a value when rented of $10,000 and a useful life at that time of 10 years.

### OPINION.

### Issue 1.

The paramount question presented for decision is the taxability of a Rockefeller Public Service Award received by petitioner.

Petitioner contends that the Award is excludible from gross income in its entirety under the provisions of section 74(b) of the Code of 1954.[2]

---

[2] SEC. 74. PRIZES AND AWARDS.

   (a) GENERAL RULE.—Except as provided in subsection (b) and in section 117 (relating to scholarships and fellowship grants), gross income includes amounts received as prizes and awards.

   (b) EXCEPTION.—Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement, but only if—

      (1) the recipient was selected without any action on his part to enter the contest or proceeding; and

      (2) the recipient is not required to render substantial future services as a condition to receiving the prize or award.

To be excluded from gross income under this section, the amounts received by petitioner must pass a three-fold test: The award must be primarily in recognition of recipient's achievements in specified areas; the recipient must have been selected without any action on his part to enter the contest or proceeding; and there must have been no requirement that he render substantial future services as a condition to receiving the award.

We need not pass on the question of whether the Award received by petitioner was primarily in recognition of past civic achievement, or whether he was required to render substantial future services as a condition to receiving it.

It is clear on the affirmative evidence that he became an applicant selected for the Award as a result of his own direct application with an accompanying proposed program of study, both prepared and filed by him. The selection of petitioner was initiated by action which he himself took to enter the contest or proceeding. It may be added that at the time officially announced as the last day for filing applications, petitioner had not been selected for the Award and was not known to be a candidate. Only later, upon his filing of his own direct application with accompanying data, was he considered and selected. Under these circumstances, we think that not only can it be said that petitioner was not selected without any action on his part to enter the contest or proceeding, in view of the unequivocal language of section 74(b) (1), but that a contrary view is affirmatively established.

Petitioner, in support of his position, cites Rev. Rul. 57–67, 1957–1 C.B. 33, as authority for the proposition that the Commissioner himself agrees that the language of section 74(b) is to be construed in a sweeping and broad manner. Petitioner further contends that this ruling, on its facts, supports his position that the Award is excludible from gross income.

The essential facts in the ruling are as follows: A corporation made awards to high school students to encourage them in their scholastic and citizenship training. The awards were given primarily in recognition of the students' past achievements in scholastic and citizenship fields. The faculty selected a certain number of certificate winners from its student body. It also selected a lesser number as trophy winners, who were to be judged with winners and honor students for possible cash awards. The students themselves did not apply for consideration for the awards nor did they participate in any function other than their usual student activities. The students selected by the faculty as trophy winners were required to fill out written forms and appear for personal interviews so that some appraisal could be made of their character, personality, cooperation in group discussion, and soundness of thought and logic.

The ruling, in holding that the final or cash awards were excludible from gross income under section 74(b), stated in part (p. 34) : "The appearances for personal interviews and the filing of written forms are not for the purpose of entering the contest or proceeding."

We think the circumstances giving rise to the ruling differ widely from those presented in the instant case. The students referred to in the ruling were originally selected without any action on their part. They were already under consideration for an award when they were required to fill out written forms and appear for personal interviews. The forms and interviews were required by the faculty, and nothing in the nature of an application or self-nomination was submitted.

On the facts before us, however, we must hold, as above indicated, that the Rockefeller Public Service Award received by petitioner fails to satisfy the statutory conditions of section 74(b)(1).

Respondent determined that the Rockefeller Public Service Award received by petitioner was a fellowship grant governed by section 117 of the Code of 1954.[3]  In accordance with section 117(b)(2)(B). respondent excluded $300 per month from petitioner's gross income for each of the months in question while petitioner was engaged in his program of study. The total amount so excluded was $3,600.

Having decided that the Award received by petitioner is not governed by section 74 of the Code, the most favorable treatment we

---

[3] SEC. 117.  SCHOLARSHIPS AND FELLOWSHIP GRANTS.

   (a) GENERAL RULE.—In the case of an individual, gross income does not include—
     (1) any amount received—
       (A) as a scholarship at an educational institution (as defined in section 151 (e) (4)), or
       (B) as a fellowship grant,
including the value of contributed services and accommodations; and
     (2) any amount received to cover expenses for—
       (A) travel,
       (B) research,
       (C) clerical help, or
       (D) equipment,
which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.
   (b) LIMITATIONS.—

     \*      \*      \*      \*      \*      \*      \*

     (2) INDIVIDUALS WHO ARE NOT CANDIDATES FOR DEGREES.—In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B).
       (A) CONDITIONS FOR EXCLUSION.—The grantor of the scholarship or fellowship grant is an organization described in section 501(c)(3) which is exempt from tax under section 501(a), the United States, or an instrumentality or agency thereof, or a State, a Territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia.
       (B) EXTENT OF EXCLUSION.—The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4)).

can allow petitioner is to accept respondent's determination in the instant case that the Award received by petitioner was a fellowship grant. In view of our acceptance of the determination in this respect, an extended discussion of section 117, as it defines fellowship grants, is not required.

In the statutory notice of deficiency, no allowance was made for any expenses incurred by petitioner which were incident to his fellowship grant. The petition filed by Isenbergh places in issue certain expenditures which he claims were expenses incurred in connection with his program of study. Our findings of fact set forth those expenses which were incident to the fellowship grant and therefore excludible from gross income under the provisions of section 117(a)(2).

Respondent, on brief, concedes the amount of the expenses claimed by petitioner as having been incurred, either for travel or in connection with his plan of study. We have so found these undisputed amounts. In addition, petitioner rented an apartment in Paris, paying $400 a month rent. One of the rooms in the apartment is a study wherein petitioner performed a major portion, outside of traveling, of the work connected with his program of study. This work consisted of the writing up of various materials needed by petitioner and the interviewing of various persons from whom information was solicited. The room was used for both personal and business entertaining, and petitioner's children used the room from time to time.

Petitioner claimed $150 a month as rental expense incurred in connection with the use of the room in question. Respondent contests this amount and contends that petitioner has not carried his burden of proof as to this allocation.

The record does not disclose the number of rooms in the apartment nor the amount of floor space allocated to the study. We have no reason to doubt that the study was used extensively by petitioner in the course of his research program. Applying the applicable principles in *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), we find that the rental expense attributable to the study was $75 a month.

Respondent, relying on section 1.117–1(b) of the Income Tax Regulations,[4] contends that none of the expenditures which, with one exception, he concedes were incurred in connection with petitioner's

---

[4] SEC. 1.117–1 EXCLUSION OF AMOUNTS RECEIVED AS A SCHOLARSHIP OR FELLOWSHIP GRANT.—

(b) *Exclusion of amounts received to cover expenses.*—(1) Subject to the limitations provided in subparagraph (2), any amount received by an individual which is specifically designated to cover expenses for travel (including meals and lodging while traveling and an allowance for travel of the individual's family), research, clerical help, or equipment, is excludable from gross income provided that such expenses are incident to a scholarship or fellowship grant which is excludable from gross income under section 117(a)(1). * * *

plan of study, are to be excluded from gross income as expenses incident to a fellowship grant because no amount of the Award was specifically designated for such expenses.

Petitioner first began receiving payments in April 1954. These payments continued until June 1955. The regulation relied on by respondent was filed in final form on June 29, 1956,[5] and was intended to apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954. Notice of the proposed regulations on this section was announced on September 29, 1955.[6] Thus, at no time during the entire period in question in which petitioner was receiving payments under the Award and incurring incidental and necessary expenses, were there any regulations, either proposed or final, implementing this section of the Code.

Section 117 clearly contemplates the exclusion from income of expenses relating to travel, research, clerical help, or equipment which are incident to a fellowship grant, but only to the extent the amounts are expended by the recipient.[7] In other words, to the extent that the expenses are substantiated and are incident to the fellowship grant, they are excludible from gross income.

Both the selection committee and petitioner anticipated that certain expenses would be incurred by petitioner which would be incidental to the carrying out of his proposed plan of study. Our findings set forth those expenses which were substantiated and incidental to the fellowship grant.

As noted above, the regulation was finalized on June 29, 1956. We have no occasion here to consider the question of whether or not the regulation represents, in general, a reasonable interpretation and implementation of the statute. We do think it is clear, however, that the requirement in the regulation to the effect that the amount to be excluded from gross income be only such as is "specifically designated to cover expenses" is not to be construed to exclude expenses not so specifically designated in relation to a grant allowed and expenses incurred prior to the time that the restrictive language of the regulation was made public, where no like language is to be found in the statute. There, neither petitioner, the selection committee, nor the respondent could possibly have anticipated the precise requirements of the future implementing regulations at the time the Award was made.[8]

The evidence convinces us that both petitioner and the selection committee knew that petitioner would incur expenses incident to the

---

[5] T.D. 6186, 1956–2 C.B. 104.
[6] 20 Fed. Reg. 7257 (1955).
[7] H. Rept. No. 1337, 83d Cong., 2d Sess. (1954), pp. 17, A37 (Ways and Means Committee) ; S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), pp. 18, 188 (Senate Finance Committee).
[8] The proposed regulations issued on September 29, 1955, did not contain the requirement as found in the final regulations, that the amounts received to cover expenses must be "specifically designated" as such.

carrying out of his program of study. While the exact amounts were not known in advance, it was quite apparent that they would be substantial.

While it was the aim of the Award to allow recipients to complete their projects without financial sacrifice, that goal was not reached as far as petitioner was concerned. The maximum Award was $17,500. Petitioner's salary at the time he received the Award was $13,200. The difference between these two figures was not sufficient to cover the necessary expenses that were reasonably anticipated at the time the Award was granted and accepted. Respondent, on brief, concedes that some part of the Award was intended to be equivalent to petitioner's then salary and that some portion was for expenses. Respondent contends, nevertheless, that unless petitioner establishes what portion was specifically designated for expenses, no exclusion is permitted under the regulations, *supra.*

The regulation relied on by respondent is obviously intended as a practical administrative implementation of the law, but, as indicated above, we think it could not be intended to apply to the factual situation before us, where the arrangements were made long prior to the issuance of either proposed or final regulations. See *Gaynor News Co.*, 22 T.C. 1172, 1178 (1954).

The expenses claimed by petitioner, to the extent set forth in our findings, have been satisfactorily substantiated; were reasonably anticipated by petitioner and the selection committee; and were incidental to the grant given petitioner.

We hold that, to the extent so found, those portions of the grant are excludible from petitioner's gross income in the respective amounts and for the respective years in question under section 117(a)(2).

Petitioner, for the first time on brief, attempts to raise a question of whether the taxability of the Rockefeller Public Service Award received by him can be validly governed by either section 74 or section 117. He contends that to apply either of these sections in the instant case would be violative of the due process clause of the Fifth Amendment.

Petitioner argues as follows: At the time he received the Award in April 1954, he could have requested that the total amount be given to him, and that for all practical purposes and for tax purposes, the transaction was complete in that month. At that point in time, the moneys were not income to petitioner but would be classified as a gift under the applicable sections of the Code of 1939 and cited cases and Commissioner's rulings thereunder. Sections 74 and 117 appear for the first time in the Code of 1954 which became effective in August of that year and were applied retroactively to cover all of the year 1954. Petitioner maintains that what is attempted here is to tax retroactively

as income, money which, at the time it was made absolutely available to petitioner, was a gift. He states that this situation must be governed by the decision of *Untermyer* v. *Anderson*, 276 U.S. 440 (1928), in which the Supreme Court held that under the due process clause of the Fifth Amendment a gift tax could not be applied retroactively to a transfer by way of gift which was completed prior to the time the gift tax became law.

Petitioner has not raised this issue in his pleadings or assignments of error under the applicable rules of this Court. This Court has consistently held that the constitutionality of a statute will not be considered where it is not specifically raised in the pleadings. *Muriel Dodge Neeman*, 13 T.C. 397, 399 (1949), affd. 200 F. 2d 560 (C.A. 2, 1952), certiorari denied 345 U.S. 956 (1953); *Estate of Louis Solowey*, 15 T.C. 188 (1950), affd. 189 F. 2d 968 (C.A. 2, 1951), certiorari denied 342 U.S. 850 (1951); *Antoinette M. Faraco*, 29 T.C. 674 (1958), affd. 261 F. 2d 387 (C.A. 4, 1958).

Under the circumstances, we hold that the constitutional issue is not before us and we see no occasion to consider it on the merits.

*Issue 2.*

In his returns for 1954 and 1955, petitioner claimed a depreciation deduction on furnishings in his rented house based upon a valuation of $10,000 and a useful life of 5 years at the time he rented them. Respondent did not adjust the valuation, but petitioner has claimed an increased valuation of $11,925 in his pleadings. Respondent determined that the furnishings should be depreciated on the basis of a useful life of 10 years.

The burden of proof of error in respondent's determination with respect to valuation and useful life rests with petitioner. We think he has failed to sustain his burden in either respect.

Petitioner originally claimed depreciation based on the valuation of $10,000 on his returns. He now claims an increased amount of $11,925. He does not contend, nor is there any evidence, that he omitted any specific items from his original evaluation. He admitted that the valuation was based on his own estimate. He has offered no evidence to show that his original estimate was inaccurate, and he has offered no evidence to show on what basis he claims the increased valuation.

Petitioner's evidence of useful life is similarly based upon his own inexperienced personal judgment. He admitted that the valuation of 5 years was a guess. The record does not set out in detail to whom the house was rented, to what use the furnishings were put, nor precisely what type of furnishings were involved.

Petitioner testified that his guess regarding useful life was confirmed because, upon his repossession of the house, the furnishings showed considerable wear and tear, and that it was clear to him that at the end of 5 years of similar use, the furnishings would be junk.

The record does not establish that the furnishings would have been put to similar use for 5 years. If any inference can fairly be had from the evidence, it is that petitioner intended to and did return to his home after an absence of 1 year. Petitioner's conclusion that the furnishings would be junk at the end of 5 years is not supported by any corroborative evidence but is merely petitioner's guess.

We hold, therefore, as above indicated, that petitioner has failed to prove error in respondent's determination as to valuation and useful life of said furnishings.

*Decision will be entered under Rule 50.*