*An appropriate decision will be entered.*

STEVAN DUROVIC, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1579–65, 4976–67, 3335–70, 6872–71.      Filed January 28, 1985.

---

*Leslie R. Bishop* and *Leonard S. DeFranco*, for the petitioner.

*Bryan R. Sullivan*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes:

| | | | Additions to tax | | |
|---|---|---|---|---|---|
| Docket No. | Year | Deficiency | Sec. 294(d)(1)(A), I.R.C. 1939 | Sec. 6653(b), I.R.C. 1954[1] | Sec. 6654, I.R.C. 1954 |
| 1579–65 | 1954 | $27,878.07 | $2,568.73 | $13,939.04 | - - - |
| | 1955 | 55,627.76 | - - - | 27,813.88 | $1,554.05 |
| | 1956 | 34,686.53 | - - - | 17,343.27 | 967.69 |
| | 1957 | 84,498.51 | - - - | 42,249.26 | 2,362.02 |
| | 1958 | 64,535.04 | - - - | 32,267.52 | 1,803.01 |
| 6872–71 | 1959 | 101,646.22 | - - - | 50,823.11 | - - - |
| | 1960 | 318,643.33 | - - - | 159,321.67 | - - - |
| | 1961 | 403,705.48 | - - - | 201,960.74 | - - - |
| | 1962 | 305,501.02 | - - - | 152,750.51 | - - - |
| 4976–67 | 1963 | 346,444.85 | - - - | 173,222.43 | - - - |
| 3335–70 | 1964 | 184,501.13 | - - - | 93,808.81 | - - - |

After concessions, the issues for decision are: (1) The determination of the amounts of the items to be included in the cost of goods sold for a partnership engaged in the business of distributing and selling a drug called Krebiozen and the foreign exchange rate to be applied to such amounts; (2) whether the petitioner is liable for additions to tax for failure to file timely declarations of estimated tax for the taxable year 1954 under section 294(d)(1)(A) of the Internal Revenue Code of 1939 and for underpayment of estimated tax for the taxable years 1955 through 1958 under section 6654; and (3) whether the petitioner is liable for additions to tax for fraud under section 6653(b) for the taxable years 1954 through 1959.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Stevan Durovic, was born in Yugoslavia in 1905. He was a resident of Chicago, Illinois, at the time he filed his petition in docket No. 1579–65. He was a resident of Switzerland at the time he filed his petitions in docket Nos. 4976–67, 3335–70, and 6872–71. The petitioner did not file individual Federal income tax returns for 1954, 1955, 1956, 1957, and 1958. He filed individual Federal income tax returns with the Internal Revenue Service for 1959 through 1964.

The petitioner was an equal partner with his brother, Marko Durovic (Marko), in Duga Laboratories (Duga). The petitioner was a medical doctor, and Marko was a lawyer. They both lived in Argentina in the 1940's; the petitioner came to the United States in 1949, and Marko in 1950. While the petitioner lived in Argentina, he developed the drugs known as Kositerin and Krebiozen. He claimed that Kositerin was helpful in the treatment of hypertension and Krebiozen was helpful in the treatment of cancer. The partnership, Duga, was formed in the United States to distribute and sell Krebiozen.

Duga filed partnership returns for each of the years 1954 through 1959, which reported the amounts shown on page 105 for gross receipts, cost of goods sold, gross profit (loss), expense deductions, ordinary net income (loss), and partners' distributive shares of ordinary net income (loss).

The cost of goods sold reported on Duga's partnership returns for 1954 through 1958, and part of the cost of goods sold reported on its partnership return for 1959, were based on accumulated costs apportioned to the original supply of 200,000 ampules (original supply) of the drug Krebiozen. The ampules were distributed as follows:

*Noncommercial*
(Distributed without charge or
withheld for experimental
programs, 1949 to April 1954) ................................ 63,903

*Commercial*

| | | |
|---|---:|---:|
| 1954 | 17,752 | |
| 1955 | [2]30,977 | |
| 1956 | 23,715 | |
| 1957 | 33,357 | |
| 1958 | 24,381 | |
| 1959 | 5,915 | 136,097 |
| | | 200,000 |

The costs apportioned to the ampules distributed from the original supply were based on the following cost accumulations:

| | |
|---|---|
| Kositerin - 72,200 ampules at 17.565 | [3]M$N 1,268,193 |
| Krebiozen - 200,000 ampules at 15.025 | 3,005,000 |
| Additional Argentine expenses (not explained)[4] | 6,800 |
| Total Argentine cost (rounded to nearest M$N 100) | 4,280,000 |
| Converted into dollars ($1 U.S. = M$N 3.36, the "official" rate of exchange | $1,273,809.50 |
| Additional U.S. expenses—1949 to April 1951 | 52,202.15 |
| Total costs to nearest $100 (used for cost of goods sold for 1954) | 1,326,000.00 |
| Additional U.S. costs—May 1951 through April 1954 | 78,511.33 |
| Total costs (used for cost of goods sold for 1955 through 1959) | 1,404,511.33 |

Duga apportioned the costs accumulations only over the 136,097 ampules from the original supply that were distributed commercially. The per-ampule cost was determined as follows:

(a) 1954: $\dfrac{\$1,326,000}{136,097} = \$9.74$

(b) 1955 through 1959: $\dfrac{\$1,404,511}{136,097} = \$10.32$

---

[2]In *Durovic v. Commissioner,* 54 T.C. 1364 (1970), affd. in part, revd. in part, and remanded 487 F.2d 36 (7th Cir. 1973), on remand 65 T.C. 480 (1975), affd. 542 F.2d 1328 (7th Cir. 1976), the Court found as a fact that 30,674 ampules were commercially distributed in 1955, 23,733 in 1956, and 33,722 in 1957. The figures for the number of ampules distributed commercially in 1955, 1956, and 1957 set out in our findings of fact were taken from the petitioner's accountant's work papers.

[3]Argentine pesos as designated by the symbol M$N.

[4]See *Durovic v. Commissioner,* 54 T.C. 1364, 1377, 1395 (1970).

| | 1954 | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|---|
| Gross receipts | $149,694.10 | $205,936.73 | $171,926.98 | $263,336.53 | $217,213.36 | $325,896.53 |
| Less: Cost of goods sold | 172,957.74 | 319,682.64 | 244,738.80 | 344,244.24 | 251,611.92 | 83,064.80 |
| Gross profit (loss) | (23,263.64) | (113,745.91) | (72,811.82) | (80,907.71) | (34,398.56) | 242,831.73 |
| Less: Expense deductions | 43,960.57 | 30,161.10 | 48,110.23 | 21,851.67 | 20,741.41 | 23,536.96 |
| Ordinary net income (loss) | (67,224.21) | (143,907.01) | (120,922.05) | (102,759.38) | (55,139.97) | 219,294.77 |
| Partners' share of ordinary net income (loss): | | | | | | |
| (a) Marko | (33,612.10) | (71,953.50) | (60,461.02) | (51,379.69) | (27,569.98) | 109,647.39 |
| (b) Petitioner | (33,612.11) | (71,953.51) | (60,461.03) | (51,379.69) | (27,569.98) | 109,647.38 |

As a result of the cost apportionments, the cost of goods sold figures on Duga's returns for 1954 through 1958 were as follows:

| | Number of ampules | × per ampule cost | = Cost of goods sold |
|---|---|---|---|
| 1954 | 17,752 | $9.74 | [5]$172,957.74 |
| 1955 | 30,977 | 10.32 | 319,682.64 |
| 1956 | 23,715 | 10.32 | 244,738.80 |
| 1957 | 33,357 | 10.32 | 344,244.24 |
| 1958 | 24,381 | 10.32 | 251,611.92 |

Duga's reported cost of goods sold for 1959 was based on the following computation:

| Source | Number of ampules | × per ampule cost | = Cost of goods sold |
|---|---|---|---|
| Canada | 10,000 | 0 | 0 |
| Original supply | 5,915 | $10.32 | $61,042.80 |
| New production | 21,175 | 1.04 | 22,022.00 |
| 1959 Cost of goods sold | | | 83,064.80 |

In December 1959, the petitioner and Marko terminated Duga. In the latter part of 1959 or the early part of 1960, the petitioner formed a sole proprietorship, Promak Laboratories (Promak), and continued to sell Krebiozen.

The petitioner reported his Promak operations on a Schedule C. His returns reported the following amounts for total receipts, cost of goods sold, gross profit, other business deductions, and net profit (loss):

| | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| Total receipts | $442,676.10 | $535,494.51 | $438,731.69 | $481,964.16 | $346,792.75 |
| Less: Cost of goods sold | 23,571.78 | 11,415.55 | 14,600.35 | 13,104.50 | 15,183.60 |
| Gross profit | 419,104.32 | 524,078.96 | 424,131.34 | 468,859.66 | 331,609.15 |
| Less: Other business deductions | 399,012.48 | 449,018.80 | 460,673.52 | 403,180.70 | 302,402.12 |
| Net profit (loss) | 20,091.84 | 75,060.16 | (36,542.18) | 65,678.96 | 29,207.03 |

The petitioner's amended 1962 return reported additional development and representation expenses of $17,011.25, which

---

[5]The cost of goods sold figure for 1954 is slightly higher than the product of 17,752 times $9.74, $172,904.48. This difference was observed but not explained in Marko's case. See *Durovic v. Commissioner*, 54 T.C. 1364, 1380 (1970).

increased other business deductions and increased the reported net loss by like amounts.

On his U.S. individual income tax return for 1959, the petitioner reported his distributive share of income from Duga. His individual returns for 1959 through 1964 applied and deducted net operating loss carryforward deductions in the following manner:

|  | 1959 | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|---|
| *From Duga* | | | | | | |
| 1954 | ($33,612.10) | - - - | - - - | - - - | - - - | - - - |
| 1955 | (71,953.50) | - - - | - - - | - - - | - - - | - - - |
| 1956 | (4,081.79) | ($20,091.84) | ($36,287.39) | - - - | - - - | - - - |
| 1957 | - - - | - - - | (38,772.77) | - - - | - - - | - - - |
| 1958 | - - - | - - - | - - - | - - - | ($27,569.98) | - - - |
| *From Promak* | | | | | | |
| 1962 (amended return) | - - - | - - - | - - - | - - - | (38,108.98) | ($15,444.45) |
|  | (109,647.39) | (20,091.84) | (75,060.16) | - - - | (65,678.96) | (15,444.45) |

The other business deductions included on Schedule C of the petitioner's returns for 1960 through 1964 included the following expenses:

|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| Interest | $59,336.00 | - - - | - - - | - - - | - - - |
| Development and representation | 300,222.50 | $389,000 | $408,891.65 | $345,000 | $240,000 |

The interest expense and $300,000 of the development and representation expense claimed on the petitioner's return for 1960 was based on the petitioner's claimed payments to Armando Ferrari, a resident of Argentina. The payments related to a service contract supposedly executed by the petitioner and Mr. Ferrari on December 31, 1951. The contract provided that Mr. Ferrari was to obtain licenses, organize meetings to study the drug, publish the results thereof, and advertise the drug. In return, Mr. Ferrari would receive $30,000 per year, payable when Krebiozen was sold or when the petitioner was able to pay.

On his original return for 1962, the petitioner claimed development and representation expenses of $391,880.40, $391,000 of which was based on claimed payments of research and development expenses incurred in connection with a contract between the petitioner and Mr. Ferrari. On his

amended return for 1962, the petitioner claimed additional development and representation expenses of $17,011.25, which were based on alleged payments to Mr. Ferrari for outside help and research and development of Krebiozen.

On his 1963 return, the petitioner claimed development and representation expenses of $345,000, $306,000 of which was based on claimed payments to Mr. Ferrari and $39,000 of which was based on claimed payments to Professor M.T. Marzoratti.

Sometime during the summer of 1963, the Commissioner opened a joint investigation into the petitioner's returns for 1961 and 1962. Special Agent William Mannie and Revenue Agent Sanford Schwartz were assigned to the investigation. The investigation later was expanded to include the petitioner's tax years 1954 through 1960 and 1963. During the investigation, the petitioner did not produce any records to substantiate the cost of goods sold claimed on Duga's returns for 1954 through 1959 or for the development and representation expenses claimed on his returns for 1960 through 1963.

The criminal investigation culminated in a recommendation that the petitioner be prosecuted for evading his income taxes. By letter dated May 28, 1965, Frank C. Conley, Regional Counsel, advised the petitioner's attorneys that the criminal case against the petitioner had been referred to the Department of Justice. Sometime during February 1966, the petitioner left the United States. On March 10, 1966, the petitioner was indicted for willfully attempting to evade his income taxes for the years 1960, 1961, and 1962. The petitioner has lived in Switzerland since at least May 1967. He has never returned to the United States to face the charges set forth in the criminal tax indictment.

In his notices of deficiency, the Commissioner recomputed the income of Duga and reduced its cost of goods sold for 1954 through 1959. As a result of such adjustments, he increased the petitioner's distributable income from Duga each year. He also disallowed a net operating loss carryover claimed in 1959. For the years 1960 through 1964, the Commissioner disallowed most of the deductions for development and representation expense and the net operating loss carryover to such years. The Commissioner also disallowed an interest deduction claimed in 1960. He increased the petitioner's income by

including certain unreported interest income in 1961 and 1962. For 1954, the Commissioner determined an addition to tax for failure to file timely a declaration of estimated tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939, and for each of the years 1955 through 1958, he determined that the petitioner was liable for the addition to tax under section 6654 for underpayment of individual estimated income tax. The Commissioner determined that the petitioner was liable for the addition to tax for fraud under section 6653(b) for each of the years 1954 through 1964. Finally, the Commissioner determined that the petitioner was liable for the self-employment tax for the years 1954 through 1958 and 1962.

On June 17, 1982, the Commissioner served interrogatories and a request for production of documents on the petitioner's counsel. Such interrogatories sought information with respect to, among other things, costs incurred in research and development of Kositerin and Krebiozen, costs entering into cost of goods sold reported on Duga's returns for 1954 through 1959, expenses claimed as development and representation expenses on the petitioner's returns for 1960 through 1964, services rendered by Mr. Ferrari and ultimate disposition of funds allegedly paid to him, and loans to the petitioner and Marko. The request for production of documents asked for production of all business and bank records of the petitioner and Marko for 1940 to 1970.

On August 30, 1982, the Commissioner filed with the Court a motion to require the petitioner to provide his written consent to disclosure of bank records. Such motion asked the Court to compel the petitioner to provide his written consent to Swiss Credit Bank (Swiss Credit) to disclose bank records of his account. On August 31, 1982, the Commissioner filed a motion to compel the petitioner to respond to the discovery requests. The petitioner claimed his Fifth Amendment privilege in refusing to respond to the interrogatories and the request for production of documents. After oral argument on the motions, we, by order dated October 26, 1982, found, among other things, that the petitioner was entitled to claim the privilege against self-incrimination. We deferred action on the interrogatories. In accordance with our direction, the Commissioner revised his request for documents. Thereafter, we ordered

enforcement of the revised documents request on the ground that the records described therein were not covered by the Fifth Amendment privilege. We also ordered the petitioner to provide his consent by November 30, 1982, to Swiss Credit for the disclosure of bank records from 1959 through 1965. Finally, the order required the Commissioner to produce records in his possession after the petitioner complied with the order. In light of our ruling that the petitioner was entitled to claim the privilege against self-incrimination, the Commissioner did not continue to seek enforcement of the interrogatories. In response to that part of the October 26 order which compelled the production of documents described therein, the petitioner took the position that he did not have any records when he left the United States, and that he neither had any of the records nor knew of the existence or location of such records.

The petitioner did not provide his consent to Swiss Credit by the due date, November 30, 1982, and thereafter, the Commissioner moved to impose sanctions. The reasons given by the petitioner for his failure to give the consent were that issuance of a consent might not result in the production of documents and might violate a tax treaty between the United States and Switzerland. At the hearing held on January 26, 1983, we found that the petitioner's reasons did not constitute grounds for not providing the consent, but we gave the petitioner a second chance to comply with the October 26 order, allowing him to do so by February 16, 1983.

By letter dated February 10, 1983, the petitioner's counsel transmitted to the Court a copy of a purported letter from Swiss Credit to the petitioner, dated February 9, 1983, which stated that records for the period from January 1, 1959, through December 31, 1965, had been destroyed. In such letter, the petitioner's counsel stated that providing a consent would not result in production of records, but if it was necessary to deliver a consent, one would be prepared.

The Commissioner's counsel telephoned Briscoe Smith, an attorney representing Swiss Credit in New York. The Commissioner's counsel asked Mr. Smith to have Swiss Credit confirm that it had issued the letter dated February 9, 1983. Several days thereafter, Mr. Smith advised the Commissioner's counsel that Swiss Credit would not directly confirm that it issued

the letter, but would provide certified exemplars of the signatures appearing on the letter. On or about February 18, 1983, the Commissioner's counsel advised the petitioner's counsel that he wanted the petitioner to issue the consent.

On March 1, 1983, during a telephone call with counsel for both parties, we indicated that we would impose sanctions requested by the Commissioner, since the petitioner had not provided his consent. We pointed out to the counsel that even if Dr. Durovic gave his consent thereafter, it would be too late for the Commissioner to take up the matter with Swiss Credit and to prepare the case for trial. By letter dated March 14, 1983, the petitioner's counsel transmitted to the Court a letter dated March 9, 1983, in which the petitioner gave the required consent to Swiss Credit. By letter dated March 29, 1983, the petitioner's counsel advised the court that, contrary to the positions earlier taken, the petitioner had in fact provided his consent to Swiss Credit in January 1983.

By order dated April 4, 1983, we ordered that the Commissioner's oral motion requesting the imposition of sanctions be granted, and as sanctions, we thereby deemed established the following:

(a) The petitioner received for his own use and benefit all items claimed as development and representation expenses on his returns for 1960 ($300,222.50), 1961 ($389,000.00), 1962 ($391,880.40), 1963 ($345,000.00), and 1964 ($240,000.00) and interest expenses on his return for 1960 ($59,336.00); the petitioner on his return was not entitled to deduct any of those expenses; the expense deductions resulted in underpayments of tax; and the petitioner fraudulently, and with intent to evade tax, claimed those expenses on his returns; and

(b) The petitioner earned unreported taxable interest income in 1961 ($8,842.57) and 1962 ($10,280.00) from accounts and investments at the Royal Bank of Canada; the petitioner's failure to report the interest income resulted in an underpayment of tax; and the petitioner fraudulently, and with intent to evade tax, failed to report the interest income on his returns.

## OPINION

The first issue for decision involves the determination of the cost of goods sold by Duga for the years 1954 through 1959. To decide that issue, we must determine the costs properly allocable to the acquisition of 200,000 ampules of Krebiozen (the original supply), and then, we must decide on the foreign exchange rate applicable to such costs to convert them into

dollars. These matters were considered and decided in protracted litigation in the case of *Durovic v. Commissioner*, 54 T.C. 1364 (1970), affd. in part, revd. in part, and remanded 487 F.2d 36 (7th Cir. 1973), on remand 65 T.C. 480 (1975), affd. 542 F.2d 1328 (7th Cir. 1976). However, in the present case, each party is asking us to reconsider some of the conclusions reached in that litigation. In *Durovic*, we found that in January 1950, Marko purchased the raw material for the original supply of Krebiozen from Juan Manuel Tanoira for M$N 3,005,000. We found that Marko borrowed M$N 2 million from Armando Ferrari to pay Mr. Tanoira. The Commissioner vigorously disputes those conclusions, and he presented new evidence to support his position.

In January 1959, the petitioner and Marko withdrew funds from the account of Duga and from their personal accounts in Chicago banks and transferred such funds to the Royal Bank of Canada (Royal Bank). Such funds totaled $362,104.25. At about the same time, gold bars were purchased in approximately the same amount and deposited in approximately equal amounts in two accounts, one in Marko and Olga's name, and one in the petitioner's name. The gold bars were withdrawn in June 1961.

The petitioner opened a bank account at the Royal Bank in December 1960, and he maintained an account at Swiss Credit, Zurich, Switzerland. On December 20, 1960, the petitioner wrote at least four checks to Mr. Ferrari, three of them in the amount of $50,000 each and one in the amount of $59,336. On December 22, 1960, $359,336 was credited to Mr. Ferrari's account at the Royal Bank. On the same day, $353,946 was withdrawn from that account and credited to the petitioner's account at the Royal Bank. The address for Mr. Ferrari's account was originally 900 Lakeshore Drive, Chicago, Illinois, which was the petitioner's address, but the address for the account was changed to Sarmiento No. 355, Buenos Aires, Argentina.

In May 1961, $179,895.68 was credited to the petitioner's account at the Royal Bank. In October 1961, Promak issued seven checks payable to the Royal Bank, and the petitioner withdrew $52,000 from his personal account in a Chicago bank. All the Promak checks and the petitioner's check, totaling $441,000, were deposited in the petitioner's account at

the Royal Bank. In April 1962, the petitioner withdrew $1 million from his account at the Royal Bank and invested that amount in ten $100,000 deposit receipts at the same bank. However, by the end of the month, he liquidated such investment. The petitioner signed a receipt dated December 3, 1963, for 10 checks in favor of Swiss Credit for $100,000 each, but the receipt bore the notation "File April 26/62."

In 1962, Promak transferred $391,000 to Swiss Credit. On the worksheets of the petitioner's accountant, such checks were listed as part of Promak's research and development expenses. In a letter dated April 26, 1963, to his accounting firm, the petitioner stated that the payments to Swiss Credit in the amount of $391,000 were payments for research and development of Krebiozen incurred in accordance with a contract between the petitioner and Mr. Ferrari. In a letter to his accounting firm dated May 14, 1964, the petitioner stated that $306,000 in payments were made by Promak to Swiss Credit for research and development expenses incurred in accordance with a contract between the petitioner and Mr. Ferrari. In the same letter, the petitioner stated that he personally paid $39,000 in December 1963 to Prof. M.T. Marzoratti for research and development in connection with Krebiozen.

From May through November 1964, the petitioner purchased $449,000 worth of deposit receipts at the Royal Bank. During the same period, he withdrew $211,000, leaving $238,000 in deposit receipts as of November 1964.

The Commissioner also presented evidence showing inconsistent statements by Mr. Ferrari as to the reasons for the payments to him. An agent of the IRS first interviewed Mr. Ferrari in 1964, and at that time, Mr. Ferrari stated that he loaned $300,000 to the petitioner in 1949 or 1950. He emphatically declared that he never rendered any services for the petitioner, and said that he understood that the 1951 contract was merely to evidence the loan. However, when the agent interviewed him again in 1965, Mr. Ferrari stated that he had worked on behalf of the petitioner, distributing literature to doctors in South America and attempting to secure licenses. He claimed that the $350,000 deposited in his account at the Royal Bank was in payment for his services. He also reiterated that he had loaned money to the petitioner and declared that

the funds deposited in his account at Swiss Credit were in payment of that loan.

The Commissioner called the special agent who had conducted an investigation of the Durovics for the purpose of showing that the Durovics and their representatives had made inconsistent statements concerning the availability of the records relating to the costs of Krebiozen and Kositerin. In *Durovic*, the Court found as a fact that all the business records relating to the costs incurred by the Durovics in Argentina in the production of Krebiozin and Kositerin were lost in the mail in 1956. However, the special agent testified that a representative of the Durovics told him in 1964 that such records could be secured from Argentina in 3 days. The representative also told the agent that the Durovics had furnished the Commissioner with such records in 1951. In response to the Commissioner's request for the production of documents in 1982, the petitioner declared that he had no such records, but within a month before the trial, he produced an alleged contract with Maria Teresa P. de Marzoratti purportedly executed in Argentina in 1949 calling for her to perform research for him.

The Commissioner argues that this new evidence undermines the basis for the Court's findings in *Durovic*. He maintains that such evidence casts substantial doubt on the Court's findings that Marko had purchased Krebiozen from Mr. Tanoira and that he had borrowed M$N 2 million from Mr. Ferrari to finance such purchase. The Commissioner suggests that the transfers of funds from the United States to Canada and to Switzerland evidence a scheme of concealment. He urges that such transfers, together with the inconsistent statements by Mr. Ferrari, indicate that the Court should not have believed Marko when he claimed to have borrowed the money from Mr. Ferrari. The Commissioner suggests that the funds allegedly transferred to Mr. Ferrari may not have actually left the petitioner's control, that there is substantial doubt as to whether any payments to Mr. Ferrari were for services or in repayment of a loan, and that in any event, Mr. Ferrari apparently cooperated with the petitioner to serve as a front man in the petitioner's plan of concealment. Because of the sanctions imposed on the petitioner for his failure to comply with the Court's order, we are not concerned with the establishment of the facts in 1960 through 1964. Yet, the

Commissioner vigorously contends that the petitioner's obvious plan of concealment and the repeated inconsistent statements by him and his representatives should be considered by us and should convince us not to accept the Court's earlier findings with respect to the cost of goods sold.

In speaking of its task, the Court observed in *Durovic* (54 T.C. at 1393):

> The record of this case exceeds 1,300 pages. In addition, both parties have benefited us with scores of exhibits and interrogatories. Notwithstanding this mass of evidentiary matter, the picture we have before us of the events which comprise this case is blurred and cracked with age. In some instances witnesses were called upon to reconstruct with clarity events which occurred more than a quarter of a century ago. The uncertain narrative occasioned by the dimmed memories of these individuals only served to compound with inconsistency a case which would have been difficult to try under the most favorable of circumstances. Nevertheless, we have attempted in our findings of fact to weigh all such inconsistencies, and to arrive at a fair and rational narration of the events which occurred herein. * * *

In his brief, the petitioner sought to defend his position by invoking the doctrine of collateral estoppel. However, he had not pleaded such doctrine, and consequently, he cannot rely upon it. See *Barber-Greene Americas, Inc. v. Commissioner*, 35 T.C. 365, 390 (1960); *Isenbergh v. Commissioner*, 31 T.C. 1046, 1057 (1959); *Wentworth Manufacturing Co. v. Commissioner*, 6 T.C. 1201, 1208 (1946). Under such circumstances, our decision must be governed by the principle of stare decisis. Although two cases may involve substantially the same facts, under the principle of stare decisis, the same result is not compelled where there are material factual differences. *Jefferson v. Commissioner*, 50 T.C. 963, 967 (1968); *Golden Rule Church Association v. Commissioner*, 41 T.C. 719, 730–731 (1964); *Rowan v. Commissioner*, 22 T.C. 865, 872 (1954).

By now, another decade has passed, and we have more exhibits and more testimony. Nevertheless, the record remains unclear. The events in 1960 and subsequently have only a remote connection with the acquisition of Krebiozen in 1950. These events do raise many questions, and they do serve to cast some doubt on Marko's account of the circumstances surrounding the acquisition of Krebiozen. Yet, the Court carefully weighed all the evidence presented to it in *Durovic*, and although the new evidence does raise some additional

questions, it is not sufficient to convince us that there is a material difference in this case that should lead us to a different conclusion.

The Commissioner contends that the uncertainties are largely due to the petitioner's failure to produce evidence and to his claim of the Fifth Amendment. Yet, we concluded that he has a right to claim the Fifth Amendment. We have imposed, admittedly severe, sanctions for the petitioner's failure to comply with the order of the Court, and we believe that such sanctions adequately deal with the petitioner's failure to produce evidence. After a review of the Commissioner's arguments and new evidence, we have decided that the petitioner may properly include in the cost of goods sold: the M$N 3,005,000 paid by Marko to Mr. Tanoira for the original supply of Krebiozen and $105,387.38 in additional U.S. expenses.[6]

Nor are we convinced by the petitioner's attempt to have us reconsider our earlier conclusion with respect to the foreign exchange rate to be used in computing the cost of goods sold for Duga. That subject was extensively considered by this Court in its opinions and by the Seventh Circuit in its opinions. After extensive exploration of this issue, it was held that the free rate should be used for such purposes. Although the petitioner has requested that we reconsider such conclusion, he has given us no sufficient basis in fact or law for reaching a different conclusion, and consequently, we will adhere to the earlier conclusion.

Since we have rejected both the Commissioner's and the petitioner's requests to reconsider the basic conclusions of the Court in *Durovic*, it follows that the findings of the Court in that case, as modified in our findings of fact, will be applied to determine the cost of goods sold by Duga for the years 1954 through 1959 in the present case.[7] As a result of such

---

[6]In the present case, the Commissioner has conceded that the partnership may properly deduct $105,387.38 in additional U.S. expenses, the amount allowed by the Court in Marko's case. See *Durovic v. Commissioner*, 487 F.2d 36, 43 (7th Cir. 1973), on remand 65 T.C. 480, 482 (1975), affd. 542 F.2d 1328 (7th Cir. 1976). The petitioner has not argued that we should allow him more than that amount.

[7]The petitioner has not argued against and has conceded the following: (1) The accumulated costs of Krebiozen do not include any Kositerin costs or additional Argentine costs. See *Durovic v. Commissioner*, 54 T.C. 1364, 1395–1397 (1970). (2) The accumulated costs should be allocated over the 200,000 ampules and not just the 136,097 ampules commercially distributed. See *Durovic v. Commissioner*, 54 T.C. at 1394. (3) Costs allocated to the free distribution of 63,903 ampules of

conclusion, whether the petitioner is entitled to any carryover of a net operating loss for 1959 or 1960 will be determined in the parties' computations under Rule 155, Tax Court Rules of Practice and Procedure.[8]

The next issue for decision is whether the petitioner is liable for additions to tax for failure to file timely declarations of estimated tax for the taxable year 1954 under section 294(d)(1)(A) of the Internal Revenue Code of 1939 and for underpayment of estimated tax for the taxable years 1955 through 1958 under section 6654.

In *Durovic v. Commissioner, supra,* the Court held that Marko was not liable for the addition to tax for 1954 under section 294(d)(1)(A), I.R.C. 1939. The Court found that he had relied on the tax expertise of his accountant, Harry Grauer, and that such reliance was reasonable since Marko, to the Court's knowledge, had not, prior to 1954, had occasion to file returns for U.S. income.

In the present case, the Commissioner argues that the petitioner knew that the cost of goods sold figure supplied to Mr. Grauer was false and that, accordingly, the petitioner cannot show reasonable cause to excuse his failure to file timely declarations of estimated tax for 1954. However, we have not been convinced by the Commissioner that we should reconsider our conclusions in the earlier case. We believe that the factors cited by the Court in Marko's case to establish reasonable cause are equally applicable to the petitioner. Accordingly, we hold that the petitioner is not liable for any addition to tax for failure to file timely declarations of estimated tax for 1954 under section 294(d)(1)(A), I.R.C. 1939.

The additions to tax for underpayment of estimated tax for 1955 through 1958 are governed by section 6654. Unlike section 294(d)(1)(A), I.R.C. 1939, section 6654 has no provision relating to reasonable cause and lack of willful neglect; it is mandatory, and extenuating circumstances are irrelevant. *Durovic v. Commissioner,* 54 T.C. at 1400. In the present case, the petitioner has not shown that he is entitled to application

---

Krebiozen cannot be amortized or otherwise deducted during 1954 through 1959. See *Durovic v. Commissioner,* 54 T.C. 1364, 1394 (1970), affd. in part, revd. in part, and remanded 487 F.2d 36, 44 (7th Cir. 1973), on remand 65 T.C. 480, 498–506 (1975), affd. 542 F.2d 1328, 1334 (7th Cir. 1976). (4) The petitioner is not entitled to any deduction during 1954 through 1964 for any loans from Ada Bossard von Martini. See *Durovic v. Commissioner,* 54 T.C. at 1368–1372, 1396–1397.

[8] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

of any of the exceptions to section 6654. Accordingly, we hold that the petitioner is liable for the addition to tax under section 6654 for 1955 through 1958. *Grosshandler v. Commissioner*, 75 T.C. 1, 20–21 (1980); *Ruben v. Commissioner*, 33 T.C. 1071, 1072 (1960).

Now we reach the issue of fraud. Our review of the Commissioner's new evidence and our refusal to reach different conclusions with respect to the cost of goods sold for Duga are dispositive of the issue. In *Durovic*, the Court held that the Commissioner had failed to prove fraud on behalf of Marko. In the present case, we also believe and hold that the Commissioner has failed to prove fraud on behalf of the petitioner for the years 1954 through 1959.

The effects of our order imposing sanctions on the petitioner for his failure to comply with the Court's order with respect to Swiss Credit are to sustain the deficiencies determined by the Commissioner for 1960 through 1964 and to sustain the additions to tax for fraud determined by him for such years.[9] The petitioner requests that we reconsider such order.

The petitioner argues that for us to deem fraudulent intent established is an anomaly and represents a unique precedent. However, we did not merely deem fraudulent intent established; rather, as a sanction for the petitioner's failure to comply with our prior order, we deemed established certain facts. The Commissioner has the burden of proving fraud by clear and convincing evidence, and he may carry his burden by relying on facts deemed established by reason of a Court order. *Rechtzigel v. Commissioner*, 79 T.C. 132, 139–143 (1982), affd. per curiam on another issue 703 F.2d 1063 (8th Cir. 1983); *Marcus v. Commissioner*, 70 T.C. 562, 571–573 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). The facts which we have deemed established are sufficient for the Commissioner to carry his burden of proof and to show that there was a fraudulent underpayment of taxes by the petitioner.

---

[9]In his petition, the petitioner raised the statute of limitations as a bar to the determination and assessment of a deficiency for 1964. In our order dated Apr. 4, 1983, we deemed established the fact that the petitioner fraudulently, and with intent to evade tax, claimed development and representation expenses of $240,000 for 1964 which resulted in an underpayment of tax for that year. Accordingly, the statute of limitations remains open under sec. 6501(c)(1) and it does not bar the determination and assessment of a deficiency for 1964. *Estate of Temple v. Commissioner*, 67 T.C. 143, 159–160 (1976); *Harper v. Commissioner*, 54 T.C. 1121, 1142 (1970).

Where, as in the present case, there is a willful failure to comply with an order of this Court, we may impose appropriate sanctions including deeming established facts sufficient to show fraud. Admittedly, the sanctions are severe, but we concluded that they were necessary and appropriate under the circumstances. We have here a case involving extensive, stale evidence, and many of the events and transactions occurred outside the United States. As a result, proof is difficult at best. Our objective was to provide both parties with a fair opportunity for a trial, and to do so, we felt compelled to exercise to the utmost and with vigor the powers of the Court to compel the production of needed evidence.

At times, the petitioner sought to explain his failure to comply by claiming that the consent would be ineffective or that the bank records were no longer in existence. We made clear to him through his counsel that those were not sufficient reasons for not complying with our order. It was not up to him to decide whether the consent would be effective or whether the bank could find the necessary records; he was told, clearly and unequivocally, to give his written consent. With that written consent in hand, the Commissioner could then have sought to secure the production of records. He could contact the bank, and he could work through the Swiss Government. He might have powers unavailable to an ordinary person. See *Ryan v. Commissioner*, 58 T.C. 107 (1972). In any event, whether the Commissioner would ultimately be successful was not before us at the time of the order. There was no showing that it would be unlawful for the petitioner to give his consent. *United States v. Vetco, Inc.*, 644 F.2d 1324, 1332 (9th Cir. 1981); *First National City Bank of New York v. Internal Revenue Service*, 271 F.2d 616, 619–620 (2d Cir. 1959). Because of the severity of the requested sanctions, we explained these matters to the petitioner through his counsel on several occasions and made clear that all he was expected to do was give his written consent—a simple act—and that the failure to give such consent would constitute a violation of our order. By March 1, 1983, only a little more than a month before the trial, he had refused to give such consent, and consequently, we concluded that it was then too late for the consent to be of any use—if the consent was given after that date, the Commissioner would not have sufficient time to take the matter up with

the Swiss bank and the Swiss Government to find out what records could have been secured. Though the sanction is severe, the petitioner had ample opportunities to comply with the Court's order and to avoid the sanctions. Under the circumstances, we remain of the opinion that the sanctions are appropriate.[10]

*Decisions will be entered under Rule 155.*

---

[10]In his brief, the Commissioner requests that we modify the sanctions we imposed and allow the petitioner $222.50 in 1960 and $880.40 in 1962 as development and representation expenses since the Commissioner did not disallow such amounts in his notice of deficiency. For such reasons, we modify our prior sanctions and hold that such deductions shall be allowed in computing the decision under Rule 155.

